## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| LUMIMOVE, INC., DBA WPC TECHNOLOGIES, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) ) |
| Defendant, | ) ) ) |
| and | ) ) ) |
| HABICH GMBH, | ) ) ) |
| Defendant-Intervenor. | ) ) ) ) |

Before: The Honorable Joseph A. Laroski, Jr

Court No. 24-00105

**Public Version**

## PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Lumimove, Inc. d/b/a WPC Technologies ("WPC") respectfully moves this Court for an order granting judgment on the agency record against Defendant, the United States. WPC is entitled to judgment in its favor, as explained in the accompanying memorandum of law.

WHEREFORE, WPC respectfully moves this Court to enter an order granting its motion for judgment on the agency record, setting aside as unlawful the final determination of the U.S. Department of Commerce challenged herein, and remanding the final determination for reconsideration in accordance with the Court's decision.

Respectfully submitted,

/s/ Nithya Nagarajan
Nithya Nagarajan
Jeffrey S. Neeley
Jamie L. Shookman
Joseph S. Diedrich
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue NW, Suite 1000
Washington, DC 20006
(202) 378-2334
nithya.nagarajan@huschblackwell.com

*Counsel for Plaintiff*

Dated: December 5, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| LUMIMOVE, INC., DBA WPC TECHNOLOGIES, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) Before: The Honorable Joseph A. ) Laroski, Jr ) |
| Defendant, | ) Court No. 24-00105 ) |
| and | ) **Public Version** ) |
| HABICH GMBH, | ) ) |
| Defendant-Intervenor. | ) ) ) |

## WPC TECHNOLOGIES' MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Nithya Nagarajan. Esq.
Jeffrey S. Neeley, Esq.
Jamie L. Shookman, Esq.
Joseph S. Dietrich, Esq.

HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue NW, Suite 1000
Washington, DC 20006
Tel. (202) 378-2357

*Counsel for Plaintiff*

Dated: December 5, 2024

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

      A.    Administrative Decision Under Review ........................................................1

      B.    Issues Presented ..........................................................................................1

II.   SUMMARY OF THE ARGUMENT ................................................................ 1

III.  STATEMENT OF FACTS ............................................................................... 4

      A.    The Antidumping Order on Strontium Chromate from Austria .............4

      B.    Commerce's Administrative Review................................................................4

      C.    Commerce's Preliminary Determination.......................................................8

      D.    Commerce's Verification and Final Results ...............................................10

IV.   STANDARD OF REVIEW ............................................................................ 12

V.    ARGUMENT.................................................................................................. 13

      A.    Commerce's determination that Habich is not "affiliated" with
            [      ] is unsupported by substantial evidence and not in
            accordance with law. ................................................................................ 13

            1.   "Affiliation" explained. ........................................................................ 13

            2.   Commerce failed to adequately investigate and follow up on the
                 evidence and arguments presented. ....................................................... 15

            3.   As a result of its flawed and insufficient investigation, Commerce's
                 determination is arbitrary and capricious and unsupported by
                 substantial evidence. ........................................................................... 23

      B.    Commerce's determination to use third country sales from
            Mexico is unsupported by substantial evidence and not in
            accordance with law. ................................................................................ 30

            1.   Background on third country sales and "ordinary course of trade" ..... 30

            2.   Commerce ignored evidence and argument that Habich's sales in
                 Mexico were not "in the ordinary course of trade" and not
                 "representative" ................................................................................... 31

VI.   CONCLUSION................................................................................................ 34

# TABLE OF AUTHORITIES

Page(s)

Cases

*Al Ghurair Iron & Steel LLC v. United States,*
    65 F.4th 1351 (Fed. Cir. 2023) ................................................................. 25, 26, 32

*Allegheny Ludlum Corp. v. United States,*
    215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ............................................. 16

*Alloy Piping Prod., Inc. v. United States,*
    201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002) ........................................... 30, 31

*Amanda Foods (Vietnam) Ltd. v. United States,*
    714 F. Supp. 2d 1282 (Ct. Int'l Trade 2010) ............................................ 12

*Bloomberg L.P. v. Sec. & Exch. Comm'n,*
    45 F.4th 462 (D.C. Cir. 2022) .................................................................... 16, 23, 32

*Bridgestone Americas, Inc. v. United States,*
    636 F. Supp. 2d 1347 (Ct. Int'l Trade 2009) ............................................ 28

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
    701 F.3d 1367 (Fed. Cir. 2012) ................................................................. 12

*Coal. of Am. Flange Producers v. United States,*
    448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ............................................ 16, 21, 22

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ................................................................... 16

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................... 23

*Genuine Parts Co. v. Env't Prot. Agency,*
    890 F.3d 304 (D.C. Cir. 2018) ................................................................... 12, 28

*Haixing Jingmei Chem. Prod. Sales Co. v. United States,*
    277 F. Supp. 3d 1375 (Ct. Int'l Trade 2017) ............................................ 17

*Home Meridian Int'l, Inc. v. United States,*
    772 F.3d 1289 (Fed. Cir. 2014) ................................................................. 28

*Hyundai Steel Co. v. United States*,
    518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ........................................... 33

*Invenergy Renewables LLC v. United States*,
    552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) .................................... 16, 32

*Jindal Poly Films Ltd. of India v. United States*,
    365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ............................ 12, 26, 32

*Lakeland Bus Lines, Inc. v. NLRB*,
    347 F.3d 955 (D.C. Cir. 2003) ................................................................ 28

*Landry v. Fed. Deposit Ins. Corp.*,
    204 F.3d 1125 (D.C. Cir. 2000) .............................................................. 29

*Michigan v. EPA*,
    576 U.S. 743 (2015) ................................................................................ 15

*Mid Continent Nail Corp. v. United States*,
    846 F.3d 1364 (Fed. Cir. 2017) .............................................................. 12

*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019) ................................................................ 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 3, 13

*SKF USA Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ..................................................... passim

*SKF USA, Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) .............................................................. 13

*Staub Design, LLC v. Carnivale*,
    625 F. App'x 993 (Fed. Cir. 2015) ......................................................... 28

*Ta Chen Stainless Steel Pipe Co. v. United States*,
    31 C.I.T. 794 (2007) ............................................................................... 16

*Tension Steel Indus. Co. v. United States*,
    179 F. Supp. 3d 1185 (Ct. Int'l Trade 2016) ......................................... 15

*TIJID, Inc. v. United States*,
   366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005).........................................14, 15, 27, 28

*Tung Mung Dev. Co. v. United States*,
   354 F.3d 1371 (Fed. Cir. 2004) .................................................................12

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ...................................................................................12

*Vicentin S.A.I.C. v. United States*,
   503 F. Supp. 3d 1255 (Ct. Int'l Trade 2021).............................................30

<u>Statutes</u>

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................................12

19 U.S.C. § 1675(a)(2)(A)(i) ........................................................................13

19 U.S.C. § 1677(15) ....................................................................................30

19 U.S.C. § 1677(33)(G) .......................................................................13, 14, 27

19 U.S.C. § 1677b(a)(1)(B)(i) ......................................................................30

19 U.S.C. § 1677b(a)(1)(B)(ii)(I)..................................................................31

19 U.S.C. § 1677b(a)(1)(C) ..........................................................................30

19 U.S.C. § 1677m(d) ...................................................................................17

19 U.S.C. §1677b.....................................................................................8, 32

19 USC § 1677b(2)(A)(ii)..............................................................................23

<u>Rules</u>

Rule 56.2 of the Rules of the United States Court of International Trade .................1

<u>Regulations</u>

19 C.F.R. § 351.102(35)...........................................................................30, 31

19 C.F.R. § 351.102(b)(3) .......................................................................14, 15
19 C.F.R. § 351.102(b)(35) ...........................................................................33

19 C.F.R. § 351.301(c)(1)..............................................................................17

19 C.F.R. 351.102(a)(3) ............................................................................................ 5, 6

Other Authorities

*Certain Oil Country Tubular Goods From Taiwan: Final Determination of Sales at
    Less Than Fair Value,*
    79 FR 41979 (July 18, 2014) ..................................................................... 15

*Notice of Final Determination of Sales at Less Than Fair Value: Large Residential
    Washers from the Republic of Korea,*
    77 Fed. Reg. 75,988 (Dec. 26, 2012) ......................................................... 15

## I.     INTRODUCTION

On behalf of Lumimove, Inc. d/b/a WPC Technologies ("WPC" or "Plaintiff"), we respectfully submit the following brief in support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record.

### A.     Administrative Decision Under Review

The administrative determination sought to be reviewed in this case is the Final Results of Antidumping Duty Administrative Review on Strontium Chromate from Austria, for the period November 1, 2021 through October 31, 2022, issued by the U.S. Department of Commerce ("Commerce") on May 21, 2024 (the "Final Results").

### B.     Issues Presented

1.     Was Commerce's determination that Habich and its U.S. sales agent are not affiliated unsupported by substantial evidence on the record, or otherwise not in accordance with law?

2.     Was Commerce's determination to use third country sales from Mexico unsupported by substantial evidence on the record, or otherwise not in accordance with law?

## II.     SUMMARY OF THE ARGUMENT

In its Final Results, Commerce made two erroneous determinations. First, it determined that Habich and its U.S. sales agent, [                                       ], are not "affiliated." Second, it determined that normal value should be calculated based on Habich's supposed third country sales to Mexico. But Commerce's Final Results cannot stand. Commerce failed to conduct the review in a lawful way, and as a

result made determinations that are arbitrary and capricious, unsupported by sub-stantial evidence, and not in accordance with law.

*First*, Commerce lacks support for its arbitrary and capricious decision that Habich and its U.S. sales agent, [    ], are not "affiliated" within the meaning of the Tariff Act. During the review, WPC supplied specific allegations and supporting evi-dence to show that Habich and that sales agent have a commission arrangement that is commercially unreasonable on its face, which calls into question the overall rela-tionship between Habich and that agent. Indeed, the record contains clear evidence showing that the relationship between Habich and [    ] is highly suspect and, at minimum, needed to be probed further to discern if masked dumping was occurring. Despite repeated and detailed requests, Commerce failed to do so. Of course, only Commerce possessed the tools to extract the necessary information from the parties who control it; WPC has no ability to conduct discovery, subpoena documents or wit-nesses, or otherwise gather information from Habich or [    ]. WPC, however, pro-vided Commerce with a roadmap for exactly how to go about doing what it lacked authority to do itself.

Yet rather than fulfill its statutory and administrative law duty to conduct a diligent inquiry, Commerce sat on the sidelines. Once Habich threw up a single, self-serving, conclusory sentence to explain the inexplicable commission arrangement with its sales agent, Commerce folded. Commerce failed to ask necessary questions of Habich or [    ] in questionnaires or otherwise follow up on Habich's answers.

Commerce failed to examine the relationship holistically—or really at all. This dereliction of duty on the part of Commerce is independently sufficient to require remand.

But Commerce's unlawful and insufficient approach to the investigative process led to significant additional problems. Because it never followed up with Habich in any meaningful way, Commerce's determination of no affiliation is unsupported by any substantial evidence. Habich's single conclusory sentence simply does not count.

The transparent lack of evidence in the record also means that Commerce's reasoning is arbitrary and capricious. Despite WPC repeatedly alerting Commerce to the commercially unreasonable commission arrangement, Commerce ignored that "important aspect of the problem." *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 n.3 (Fed. Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). So too did Commerce entirely fail to consider the operational, as opposed to legal, aspects of the Habich/sales agent relationship. These flaws in Commerce's reasoning and in the evidence further support remand for Commerce to actually do its job, and to do it properly and reasonably.

*Second*, Commerce lacks support for its arbitrary and capricious decision to use Mexico as a third country comparison market. Because Habich's sales in its home country are insufficient, Commerce had to look elsewhere. But evidence shows that it could not look to Mexico, because the overwhelming weight of the evidence shows that Mexico simply does not exist as an independent market for Habich. Commerce ignored comments and evidence to this effect during the review. Plus, Commerce took umbrage with WPC's rightful concerns in a way that further highlights the

arbitrariness of Commerce's overall approach. As a result, Commerce's final determination is necessarily arbitrary and must be redone.

The Court should vacate the Final Results and remand for a full and thorough investigation and analysis of the relationship between Habich and [    ], and to redo its normal value calculation.

## III.    STATEMENT OF FACTS

### A.    The Antidumping Order on Strontium Chromate from Austria

On November 27, 2019, Commerce published the antidumping duty order on strontium chromate from Austria (the "Order"). The Order covers strontium chromate, regardless of form—including but not limited to powder (sometimes known as granular), dispersions (sometimes known as paste), or in any solution.

On November 1, 2022, Commerce published a notice of opportunity to request an administrative review of the Order for the period of November 1, 2021 through October 31, 2022 (the "Period of Review"). In response, Habich GmbH ("Habich") requested that Commerce conduct an administrative review of its sales during the Period of Review.

### B.    Commerce's Administrative Review

Commerce initiated its review on January 3, 2023, and it issued its first questionnaire on January 18, 2023. **PR11**. On February 8, 2023, Habich submitted its Section A response, reporting third-country sales to Vietnam and Mexico, since its home market does not have a viable market for subject merchandise. **PR13-14; CR3-4**. WPC submitted deficiency comments on February 27, 2024, noting that Vietnam was not a viable comparison market because Commerce considers it a non-market

economy. **PR18**; **CR5**. Habich submitted rebuttal comments on March 1, 2023. **PR19**; **CR6**.

On March 20, 2023, Habich submitted its Section B, Section C and Section D questionnaire responses. **PR24-PR26**; **CR7-CR75**. Notably, these responses indicated that: (1) Habich has a distributor relationship whereby it sells [      ] subject merchandise and then exerts significant control over the price at which [      ] sells to downstream, US customers; and (2) Habich and [      ] have a commission relationship whereby [      ] relies on Habich to sell to its large US customers. On April 13, 2023, WPC requested that Commerce verify Habich's responses. **PR32**.

On April 17, 2023, WPC submitted deficiency comments requesting that Commerce investigate whether Habich could support its sales to [      ] as *bona-fide* export price sales. **PR34**; **CR78**. WPC explained that Section 771(33)(G) of the Tariff Act of 1930 requires any person who "controls" any other person to be considered affiliated with such other person. "Control" means the ability to impact decisions concerning the production, pricing, or cost of the subject merchandise, which arises when a buyer becomes "reliant" on a supplier. *Id.* at 2 (discussing 19 C.F.R. 351.102(a)(3) and Statement of Administrative Action). WPC explained that [      ] appeared to be completely reliant on Habich for most of its U.S. sales. *Id.* at 3. As Habich's U.S. Sales database showed, for [    ] of the [    ] individual transactions—or [   ] percent of the entire universe of U.S. Sales—[    ] acted as Habich's selling agent.

WPC also noted that Habich's explanation of its commission relationship with [    ]—that it "only has verbal agreements in place"—was absurd on its face in that

it did not even specify a commission rate. **PR34** and **CR78** at 6 (discussing C-45). Even more preposterous, WPC explained, was the need for a commission relationship in the first place, given that several of [        ] customers are large multi-national customers with whom Habich already has a direct relationship. *Id.* at 5. For example, the record indicated that Habich sells directly to [        ] in Mexico, indicating that Habich has an independent relationship with [        ], and that [        ] has no need for a distributor such as [        ] in the United States. WPC explained that such an unexplained middleman raised the potential for price manipulation and required further investigation. *Id.*

WPC requested that Commerce exercise its authority as the investigator and examine the full extent of Habich's worldwide relationship with [        ]. *Id.* at 7. Specifically, WPC asked Commerce to investigate Habich's role in setting prices for [        ] downstream customers, and to request documentation reconciling the price charged by Habich to [

        ]. **PR34** and **CR78** at 4-5. WPC also requested that Commerce investigate the specific nature of the commission agreement between Habich and [        ] and why [                                                        ]. *Id.* at 6.

On April 27, 2023, Habich responded to WPC's comments, in which it provided no information regarding its relationship with [        ], its role in setting pricing for downstream customers, or its customers' need for a distributor when they could buy

6

directly from Habich instead. **PR39**; **CR79**. WPC submitted reply comments on May 4, 2023. **PR40**; **CR80**.

On June 29, 2023, Commerce issued its first supplemental questionnaire. **PR42**; **CR81**. While Commerce inquired about some of WPC's concerns, it neither requested information about the ultimate U.S. customers of products sold to [      ] nor documentation showing that sales to these downstream customers resulted in a commercially viable profit for [      ].

On August 4, 2023, Habich responded to the supplemental questionnaire, in which it simply denied any close supplier relationship with [      ]. **PR49**; **CR82-CR147**. Regarding its commission relationship with [      ], Habich explained that the relationship is based only on "mutual trust," and pointed to an email correspondence that it claimed contained the commission rate. *Id.* at 4, Ex. SA-03. As for third-country markets, Habich explained that it does not [

      ] in the United States and Mexico. **PR49**; **CR82-CR147**. If fact, Habich readily admitted that it negotiates prices as part of a [

      ].

WPC filed deficiency comments on September 1, 2023. **PR54**; **CR148**. Once again, WPC argued that Commerce should investigate the [

      ] and request all documentation showing the negotiation of prices with these downstream customers. *Id.* at 4-6. Further, while Habich claimed that [                  ] creates an exclusive relationship with [      ], WPC noted that Commerce still had an obligation to investigate the "business and economic

7

reality" of the relationship, not simply whether the two companies had the legal "free-dom" to transact with other entities. *Id.* at 4.

WPC also explained in its comments why Commerce cannot reasonably rely on Mexico as a valid comparison market for calculating normal value in accordance with 19 U.S.C. §1677b. **PR54** and **CR148** at 10. WPC argued that Habich's concessions clearly demonstrate that Mexico was not a separate, viable market. Instead, Habich treated the United States and Mexico as [                    ], rather than engag-ing in separate negotiations with entities in Mexico. *Id.*

Habich submitted rebuttal comments on September 7, 2023, with conclusory statements denying that Mexico was a "sham" market, but otherwise failing to ad-dress the claim that the United States and Mexico were [                    ]. **PR55; CR149**.

On October 11, 2023, Commerce issued a second supplemental questionnaire to Habich, to which Habich responded on October 25, 2023. **PR55**, **PR62**; **CR150-CR164**. Commerce asked no questions about Habich's treatment of the United States and Mexico as a [                    ], Habich's relationship with [    ], the nature of their commission relationship, or the process by which [    ] sets prices for its down-stream U.S. customers.

## C.    Commerce's Preliminary Determination

On November 30, 2023, Commerce issued the preliminary results of its admin-istrative review. **PR67**. In conjunction with its preliminary decision, Commerce is-sued its preliminary issues and decision memorandum, as well as a supplemental

"Close Supplier Relationship and Comparison Market Sales Analysis" memorandum. **PR68-PR69**; **CR166**.

Commerce preliminarily concluded that Habich and [     ] do not have a "close supplier relationship." **PR68**; **CR166**. In so concluding, Commerce relied on an out-dated written commission agreement from [          ] and emails with price lists and vague references to "high demand" and lead-times to conclude that [     ] curried no special favor from Habich, and that their relationship was simply "commercially successful and convenient." *Id.* at 3-6. Commerce also noted a supposed lack of evidence of any exclusive sales or distributor agreement between Habich and [     ], as well as a supposed lack of evidence "indicating that Habich is involved in these resale transactions [                    ] or has *direct* knowledge of the pricing or sales terms." *Id.* at 4 (emphasis added).

Commerce also preliminarily determined to use Mexico as a comparison market. **PR68**; **CR166**. In place of a detailed analysis, however, Commerce expressed frustration with WPC for having argued in previous administrative reviews that Mexico was not a viable comparison market. *Id.* at 8-10. Then, rather than address Habich's treatment of the United States and Mexico as [               ], as WPC had urged Commerce to do, Commerce simply noted that there was "no evidence" that a "small, family owned company such as Habich has manipulated or subjected [     ] to its control." *Id.* at 10.

For all those reasons, Commerce preliminary determined that Habich had no sales of subject merchandise at prices below normal value during the Period of Review.

### D.    Commerce's Verification and Final Results

On December 28, 2023, Commerce issued a notice of verification. **PR75**. On January 5, 2024, WPC submitted pre-verification comments, once again requesting that Commerce examine the full extent of Habich and [     ] relationship, including the extent to which Habich controls pricing for [     ] downstream customers. *Id.* at 2-3.

On January 8 to 12, 2024, Commerce conducted a verification of Habich's questionnaire responses, and it issued its Verification Report on March 1, 2024. **PR84**; **CR268** (Verification Report). Commerce continued to find that Habich has no direct involvement in, or knowledge of, [     ] downstream sales, and it found no discrepancies in Habich's reported sales or quarterly costs.

Following verification, the parties submitted their case briefs. WPC once again urged Commerce to seriously investigate whether a close supplier relationship exists between Habich and [     ]. **PR88** and **CR269** at 3-4. Critically, WPC explained, Commerce had never analyzed the entities' legal *and* operational relationship, despite [     ] having a touchpoint on [          ] transaction in the instant review, and [     ] being completely reliant on Habich for its strontium chromate requirements in the United States. Instead, Commerce had simply ignored WPC's primary concerns, namely, whether the [               ] effectively offered [     ] a post-sale price adjustment, and why Habich would need such an arrangement in the first place,

when it [                    ] or has existing relationships with several of the same customers.

WPC also reiterated that Mexico is not a separate and viable comparison market with which to calculate normal value, and that Commerce should revise Habich's reported costs due to [                    ] for one CONNUM. *Id.* at 15.

Commerce issued its final decision memorandum on May 14, 2024 and published its final results of its administrative review on May 21, 2024. **PR94**, **PR95**. Commerce once again determined that no close supplier relationship exists between Habich and [      ] and that an "abundance of evidence" existed on the record confirming the nature of their relationship. *Id.* at 5.

In its final decision memorandum, Commerce claimed that it had fully investigated the issues raised by WPC, including "the role and function performed by Habich in setting prices [          ]." *Id.* at 4-5. Regarding the selection of Mexico as a comparison market, Commerce once again expressed frustration that WPC had challenged this point in previous administrative reviews, while otherwise ignoring Habich's treatment of Mexico and the United States [                    ]. *Id.* at 7-8. Finally, Commerce determined that "no material discrepancies" in Habich's reported costs exist, and that it had "no reason to doubt the integrity or accuracy of Habich's cost responses." *Id.* at 9.

Consistent with its preliminary decision, Commerce determined in the final results that Habich had no sales of subject merchandise at prices below normal value

during the POR and assigned Habich a weighted-average dumping margin of 0.00 (*de minimis*).

This appeal followed.

## IV.    STANDARD OF REVIEW

The Court reviews whether Commerce's antidumping duty review determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"When reviewing for substantial evidence," the Court "must consider the whole record upon which an agency's factual findings are based, including 'whatever in the record fairly detracts' from the evidence supporting the agency's decision. *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)). "To be supported by substantial evidence, Commerce's determinations must be supported by a rational link to information." *Amanda Foods (Vietnam) Ltd. v. United States*, 714 F. Supp. 2d 1282, 1286 n.4 (Ct. Int'l Trade 2010). In other words, "Commerce must explain {its} determination and the determination must be supported by substantial evidence on the record." *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l Trade 2019).

"Not in accordance with law" includes arbitrary and capricious review. *See, e.g.*, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374, 1377 (Fed. Cir. 2012); *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537, 544–45 (Fed. Cir. 2019); *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017); *Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1378

(Fed. Cir. 2004); *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Arbitrary and capricious review requires Commerce to have "examine{d} the relevant data and articulate{d} a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. A determination is arbitrary and capricious if Commerce "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before {it}, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *SKF USA*, 630 F.3d at 1373 n.3 (quoting *State Farm*, 463 U.S. at 43).

## V.    ARGUMENT

### A.    Commerce's determination that Habich is not "affiliated" with [    ] is unsupported by substantial evidence and not in accordance with law.

#### 1.    "Affiliation" explained.

As part of an administrative review of an antidumping duty order, Commerce must "determine . . . the normal value and export price (or constructed export price) of each entry of the subject merchandise." 19 U.S.C. § 1675(a)(2)(A)(i). "Export price" means "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an *unaffiliated* purchaser in the United States." *Id.* § 1677a(a) (emphasis added).

By statute, "{a}ffiliated" means, among other things, "{a}ny person who controls any other person and such other person." 19 U.S.C. § 1677(33)(G). "{A} person *shall*

be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." *Id.* (emphasis added); *see also TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1298 (Ct. Int'l Trade 2005) ("The statute directs Commerce to find affiliation exists when evidence demonstrates that a person controls any other person.").

Regulations explain further what counts as affiliation by control. "In determining whether control over another person exists . . . , the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and *close supplier relationships.*" 19 C.F.R. § 351.102(b)(3) (emphasis added). "The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id.*

Accordingly, finding affiliation based on a close supplier relationship proceeds in two steps.

First, has the supplier or buyer become reliant on the other? *See TIJID*, 366 F. Supp. 2d at 1299; *see* Statement of Administrative Action Accompanying H.R. Doc. No. 316, 103rd Congress, 2d Session (1994) at 838 (SAA) (defining close supplier relationships as those in which the "supplier or buyer becomes reliant upon the other"). Reliance can be evidence by various factors, including, *but not limited to*, the percentage of the buyer's total purchases that are sourced from the supplier, the existence of alternative suppliers of the input, and whether there is an exclusive supply

agreement. *Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers from the Republic of Korea*, 77 Fed. Reg. 75,988 (Dec. 26, 2012), and accompanying Issues and Decision Memorandum at Comment 8. It has also been said that a close supplier relationship exists when the relationship is significant and could not be easily replaced. *See TIJID*, 366 F. Supp. 2d at 1295–1300; *see also Certain Oil Country Tubular Goods From Taiwan: Final Determination of Sales at Less Than Fair Value*, 79 FR 41979 (July 18, 2014) and accompanying Issues and Decision Memorandum at 5–6.

Second, if reliance is present, then does "the relationship {have} the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product"? 19 C.F.R. § 351.102(b)(3); *see TIJID*, 366 F. Supp. 2d at 1299; *see also Tension Steel Indus. Co. v. United States*, 179 F. Supp. 3d 1185, 1197–98 (Ct. Int'l Trade 2016) (citing *TIJID*).

### 2. Commerce failed to adequately investigate and follow up on the evidence and arguments presented.

Here, Commerce had a critical obligation to investigate, inquire, and follow up on the evidence and arguments presented to it in the course of the 2021-2022 administrative review. Commerce came up woefully short. The Supreme Court has made clear that "{n}ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

We start by explaining the multiple sources of law from which Commerce's obligation to investigate derives. *First*, this Court has explained that Commerce has

an obligation to conduct a "diligent inquiry." *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1357 (Ct. Int'l Trade 2020) (citing *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1330–33 (Ct. Int'l Trade 2000)). To be sure, "interested parties bear the burden of developing an adequate record on contested issues." *Id.* So, while Commerce "has no independent duty to make a diligent inquiry into any and all information highlighted by interested parties," it still "must investigate allegations presented by interested parties that raise a reasonable doubt about a material issue." *Id.*; *cf. Ta Chen Stainless Steel Pipe Co. v. United States*, 31 C.I.T. 794, 818 (2007) ("{T}he agency has an obligation to make questionnaire questions affected by affiliation issues clear, in light of its own recognition that affiliation is a complex concept." (cleaned up)).

*Second*, Commerce has an administrative law duty to respond to WPC's comments that pointed out areas of additional investigation. *See Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1399 (Ct. Int'l Trade 2021) (explaining an "agency's need to respond, in a reasoned manner, to any comments received by the agency that raise significant issues"); *Bloomberg L.P. v. Sec. & Exch. Comm'n*, 45 F.4th 462, 476–77 (D.C. Cir. 2022) ("Bloomberg raised relevant concerns about the direct and indirect costs of FINRA's proposal, but the Commission brushed them aside. As such, the Commission's decision was not the product of reasoned decisionmaking."); *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (stating that an agency must "respond to comments that can be thought to challenge a fundamental premise underlying the proposed agency decision"). Here, this

16

logically includes asking questions of Habich in a questionnaire when WPC provides a reasonable basis to do so.

*Third*, in the context of an antidumping review, Commerce has the sole ability to investigate and inquire. The information needed here is within Habich's control, and WPC has no access without Commerce's intervention. WPC lacks any power whatsoever to gather information from others, including Habich and [     ]: it cannot conduct discovery, issue subpoenas, or otherwise exert influence. Although Commerce lacks subpoena power, *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 277 F. Supp. 3d 1375, 1383 (Ct. Int'l Trade 2017), it does have the authority to ask questions in questionnaires, 19 U.S.C. § 1677m(d); 19 C.F.R. § 351.301(c)(1). And "Congress gave {Commerce} the authority to use facts available to fill any gaps in the record and, when certain conditions are present, to make an adverse inference in the selection of the available facts (referred to as 'adverse facts available' or 'AFA')." *Haixing Jingmei*, 277 F. Supp. 3d at 1383. "In other words, Congress has established a statutory scheme in which it ensured that the agency will have enough information to make its determinations, whether provided by an interested party in response to an information request or otherwise selected by the agency." *Id.*

Based on these three independent and clear sources of law, one would expect that Commerce would go out of its way to conduct a thorough investigation to carry out its statutorily delegated functions. Indeed, Commerce often does: this Court is no stranger to voluminous, no-stone-unturned administrative records produced by

Commerce when the responding company is from an emerging or developing market country.

But for whatever reason, Commerce's investigation in this case looks meager by comparison. And it's not just a meager appearance—Commerce's shortcomings are contrary to law. Indeed, in multiple ways, Commerce failed to investigate and meet its legal obligations, despite WPC providing specific allegations, specific facts, and specific follow-up questions. We next explain why that is so.

The record lays bare Commerce's blatant failure to inquire into the nature of the overall relationship between Habich and [      ]. Habich and [      ] have a two-part relationship. One, Habich and [      ] have a commission or "sales agent" relationship in which Habich apparently depends on [      ] to get its product to large U.S. end users; this component of the relationship is the primary focus of WPC's arguments. Two, Habich and [      ] also have a distributor relationship in which Habich sells [      ] the product, and [      ] distributes the product to small and medium U.S. end users; this component is guided by price lists and while it is not the focus of WPC's arguments, it is part of the overall commercial relationship that is of at issue in this appeal. **PR24-PR26; CR7-CR75**.

In its comments, WPC argued that the Habich/[      ] commission relationship makes no commercial sense—both on its face, and in light of evidence on the record that Habich already has direct relationships with the large U.S. end users. **PR32; PR54; CR148** (WPC's deficiency comments of April 17, 2023, and September 1, 2023). More specifically, the record shows that Habich has existing and long-term global

relationships with its large end users, including large multi-national companies like

[                    ]. Outside the U.S., Habich makes *direct* sales to these large end

users. Yet for sales to these *same* large end users in the U.S., Habich relies on [    ]

as a "sales agent" middleman. Given its preexisting global direct relationship with

the product's large U.S. end users, Habich would have no rational reason to need—or

want—an intermediary "sales agent" to facilitate sales to its large U.S. end users.

Such an arrangement is presumptively commercially unreasonable—and Habich

never provided evidence or explanation to show otherwise. One assumption that can

be made from this multi-part arrangement is that it facilitates price shifting between

transactions such as to mask dumping.

Commerce failed to follow up and obtain information in supplemental ques-

tionnaires or at verification—beyond one mere conclusory sentence—explaining why

Habich needs or wants [    ] to act as a "sales agent" for large U.S. end users, despite

the fact that Habich has a direct relationship with those end users and sells directly

to them around the globe.

Commerce did not ask this question or gather any data in support of any an-

swer. By not doing so, Commerce failed to fully investigate whether there is in fact a

situation where the *buyer or seller* is reliant on the other. To actually do so, Com-

merce would need to examine the relationship between Habich and [    ] holisti-

cally. As explained, the record shows that [    ] operated with dual functionality both

as a commission/sales agent and as a buyer/distributor of the subject goods. As also

explained, the record contains nothing showing that the commission arrangement is

necessary or commercially reasonable, because Habich already sells directly to the same large end users globally. *See supra*. So, Habich effectively pays a commission when there is no rational reason—much less any need—to do so. This commercially unreasonable and facially suspect arrangement alone—together with WPC's record-backed prompting—triggers an obligation on Commerce's part to ask "Why?" Sufficient information to answer the question is not on the record, however, because Commerce failed to pursue this line of inquiry to ensure that Habich was not hiding the true extent of the close supplier relationship with [    ]. To answer that question, Commerce would have to review in detail at *all the transactions* between Habich and [    ] (both as sales agent and as distributor) to see if these transactions are at arm's length. Indeed, comparing the sales agent transactions to the distributor transactions would shed light on any differences between those two aspects of the overall relationship. Pursuing this line of inquiry would also reveal if there were pricing differences which would reveal or unmask any dumping. Only through such a detailed and holistic examination can Commerce understand the true nature of the relationship between Habich and [    ].

WPC even supplied a specific question for Commerce to ask Habich: "Explain the role and function performed by Habich in setting prices to [

]. Who negotiates the prices and does [    ] provide updates on its [                ] to support its [

].” **PR32** and **PR54** at 4; **CR148** at 6.[1] Sure, Commerce asked a watered-down version of WPC's requested question in supplement I, A, question 1. **PR42** and **CR81** at 4. But contrary to Commerce's contention in the final decision memorandum, Habich did not provide any non-vague, substantial evidence in response. **PR94** at 5 ("We note that this very question was posed to Habich in Commerce's first supplemental questionnaire, and Habich provided a full response."). Instead, Commerce asked only whether Habich negotiates *directly* with [      ] U.S. customers, **PR42** and **CR81** at 4, which Habich simply denied. **PR49**; **CR82-CR147**. Despite asking broad-based questions throughout its investigation, and eliciting merely conclusory, self-serving answers in response, Commerce claimed to have "developed a record that contains more than sufficient information to analyze the relationship between Habich and [      ]." **PR94** at 6.

Further, Commerce claimed the record lacks evidence "indicating that Habich is involved in these resale transactions [                                    ] or has *direct* knowledge of the pricing or sales terms." **PR68** and **CR166** at 4. Once again, WPC repeatedly urged Commerce to look beyond *direct* involvement in negotiating down-stream sales and investigate Habich's broader role in setting [      ] pricing to the

---

[1] WPC stands in contrast to situation in *Coalition of American Flange Producers*: "{W}hile Coalition does identify several issues that Commerce did not adequately address on the record, it has not identified any specific information that Commerce should have solicited. The diligent inquiry obligation does not constitute a requirement that Commerce seek out additional information where an interested party has not made a showing that additional information is required." 448 F. Supp. 3d at 1357. Here, WPC "identified {the} specific information that Commerce should have solicited."

ultimate customer. **PR32**; **PR54**; **CR148**. To this end, the resale transactions are key, because if [     ] is selling [

           ], then that would be strong evidence that [                    ]

are not at arm's length, and strong evidence of reliance and affiliation between [     ]

and Habich. Yet Commerce—the only person or entity with any power to do so—re-

fused to gather that requested information.

Finally, consider Question 8 in Commerce's supplemental questionnaire: "Dis-

cuss whether Habich is [     ]'s only supplier of strontium chromate and whether Ha-

bich sells other products besides strontium chromate to [     ]." **PR42** and **CR81** at 5.

Habich responded only by saying that "{t}here is no exclusive sales or distributor

agreement between Habich and [     ]. The cooperation between [     ] and Habich

has lasted almost 20 years and is characterized by mutual trust." **PR49** at 4 and Ex.

SA-03. Despite Habich's admission of extremely close ties with [     ] and the failure

to provide complete answers to Commerce's questions, Commerce did not pursue this

line of questioning further and it never issued a second supplemental questionnaire

on this specific issue.

In sum, Commerce failed to "investigate allegations presented by" WPC, *Coal.*

*of Am. Flange Producers*, 448 F. Supp. 3d at 1357, "brushed . . . aside" WPC's com-

ments about the need to further inquire into the suspicious Habich/[     ] commission

relationship, *Bloomberg*, 45 F.4th at 476–77, and ignored the reality that only it has

the power to gather information.[2]

> ### 3.     As a result of its flawed and insufficient investigation, Commerce's determination is arbitrary and capricious and unsupported by substantial evidence.

Commerce's inadequate investigation was far from harmless: its cascading ef-

fects resulted in a lack of evidence, which in turn led to an insufficient explanation,

to support Commerce's determination that Habich and [    ] are not affiliated. Com-

merce's determinations flunk both the substantial evidence and arbitrary-and-capri-

cious tests.

Commerce determined that neither Habich nor [    ] "relied" on the other and,

as a result, were not "affiliated." However, Commerce's explanation for its determi-

nation necessarily fails for multiple reasons. Any of these reasons "alone" would be

"dispositive" and sufficient to "require{ }" remedy. *SKF USA*, 630 F.3d at 1375. Yet

the Court can also consider these "{s}everal points" "together" to "reveal a significant

mismatch" between the "decision . . . made and the rationale . . . provided." *Dep't of*

---

[2] Although not necessary for the Court to agree with WPC, Commerce's inadequate approach to the administrative review is further demonstrated by its cavalier approach to Habich's reported costs. In conducting an administrative review of an anti-dumping order, Commerce "shall request information necessary to calculate the constructed value and cost of production" to determine "whether there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that represent less than the cost of production of the product." 19 USC § 1677b(2)(A)(ii). Habich reported aberrational costs for CONNUM [
                                        ] which was only sold in the U.S. market. **PR34** and **CR78** at 13; **PR88** and **CR269** at 3-4. Commerce failed to accurately review evidence placed on the record demonstrating that Habich's reported costs were distortive and unreliable. *Id; see also* **PR94** at 9. Despite clear record evidence of discrepancies, Commerce simply used aberrational costs to calculate Habich's cost of production, contrary to statute.

*Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).[3] We address each of Commerce's failures below.

*First*, Commerce "entirely failed to consider an important aspect of the problem": the nature of the commission relationship between Habich and [    ]. *SKF USA*, 630 F.3d at 1373 n.3.

As explained above, the commission relationship between Habich and [    ] includes two distinct components. One, Habich and [    ] have a commission or "sales agent" relationship in which Habich apparently depends on [    ] to get its product to large U.S. end users; this component of the relationship is the primary focus of WPC's arguments. Two, Habich and [    ] also have a distributor relationship in which Habich sells [    ] the product, and [    ] distributes the product to small and medium U.S. end users; this component is guided by price lists and is contributory to the overall focus of WPC's arguments. **PR24-PR26; CR7-CR75**.

In its comments, WPC argued that the Habich/[    ] commission relationship made no commercial sense—both on its face, and in light of evidence on the record that Habich already has direct relationships with the large U.S. end users. **PR32; PR54; CR148** (WPC's deficiency comments of April 17, 2023, and September 1, 2023). More specifically, the record shows that Habich has existing and long-term global relationships with its large end users, including large multi-national companies like [                    ]. Outside the U.S., Habich makes *direct* sales to these large end

---

[3] Because Commerce determined there was no reliance (the first step of the close supplier relationship analysis), it never proceeded to the second step. If this Court agrees with WPC and remands, Commerce would have to consider both steps anew.

users. Yet for sales to these *same* large end users in the U.S., Habich relies on [    ] as a "sales agent" middleman. Given its preexisting global direct relationship with the product's large U.S. end users, Habich would have no rational reason to need—or want—an intermediary "sales agent" to facilitate sales to its large U.S. end users. Such an arrangement is presumptively commercially unreasonable—and Habich never provided evidence or explanation to show otherwise.

Commerce's Close Supplier Memorandum reveals that Commerce was confused. Commerce clearly did not grasp that there are two distinct components to the Habich/[    ] relationship (the distributor component and the commission/sales agent component). *See Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) ("We agree that Commerce's explanation was insufficient. We are unable to conclude that Commerce even considered AGIS's argument, and Commerce's discussion is limited to a single paragraph that is vague and conclusory and wholly fails to explain why Commerce believed that using AGIS's dataset would be improper."). WPC primarily focused on one of the two distinct components of the relationship—the commission/"sales agent" relationship. But instead of responding squarely to *this* component of the Habich/[    ] relationship, Commerce's Close Supplier Memorandum diverts to other issues. Commerce starts by acknowledging the existence of the commission/sales agent relationship but then jumps to a discussion of price lists. **PR68**; **CR166** at 3-6. But price lists relate only to the distributor component of the relationship—not the commission/sales agent component. Commerce, in fact, never explains how price lists do or even could have anything to do with the

commission relationship. Commerce simply conflates commission agreements and price lists in its memo, but those are distinct aspects of the relationship. *Id.* Additionally, Commerce writes that "Habich also explained that in [    ] capacity as a distributor, it purchases strontium chromate and resells it to [

                                                    ].'" *Id.* at 4. Again, this goes to only the distributor component of the relationship, without addressing any concern over the commission component of the relationship.

At the end of the day, Commerce's sole statement directly addressing WPC's arguments about the commission relationship parrots one sentence from Habich's questionnaire response: "In [    ] capacity as a domestic [        ], it supplements Habich's direct communication with [

        ]." **PR68; CR166** at 4. This explanation is conclusory and is not based upon substantial evidence. *See Jindal*, 365 F. Supp. 3d at 1386 ("Based on Commerce's conclusory statements, the court cannot discern the path of Commerce's decision-making nor determine that it is supported by substantial evidence.").

Ultimately, Commerce did not pay any attention to the actual focus of WPC's comments, and thus failed to consider the commercial unreasonableness of the commission relationship—an important aspect of the overall problem.

*Second* and separately, Commerce "failed to consider" another "important aspect of the problem": the "operational" relationship between Habich and [    ]. *SKF USA*, 630 F.3d at 1373 n.3. The statute defining "affiliated" is disjunctive, requiring an analysis of both legal *and* operational relationships: "{A} person shall be

26

considered to control another person if the person is legally *or operationally* in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33)(G) (emphasis added). "Operational" relationship details are necessary to examining whether the buyer or seller is reliant on the other.

In its Close Supplier Memorandum, Commerce focuses on the *legal* aspects of the Habich/[    ] relationship—for example, whether any exclusive sales agreements exist. **PR68** and **CR166** at 4-6. In doing so, Commerce wholly sidelines the "operational" aspects of the Habich/[    ] relationship. But by statute, the "operational" relationship is an important aspect of the problem that must be considered.

Commerce entirely failed to examine the *dual* [    ] co-dependency of Habich and [    ]. The record shows that [    ] of Habich's sale of strontium chromate into the U.S. involves [    ]—*and* that [    ] purchases of strontium chromate come from Habich. Indeed, the record shows that there are a total of [    ] transactions, out of which [    ] transactions are direct sales to [    ] and the remaining [    ] are sales where [    ] acted as a [    ]. This is powerful evidence of operational reliance, in which the relationship is significant and could not be easily replaced. *See TIJID*, 366 F. Supp. 2d at 1295–1300. Despite this evidence, Commerce did not engage with the dual co-dependency at all and short-circuited its analysis by ignoring the operational aspects of the close-supplier analysis.[4]

---

[4] These facts distinguish the situation here from *TIJID*. True, in *TIJID*, the mere fact that "Fay Candle sells 100 percent of its candles to TIJID" did not support a close

*Third*, Commerce's determination also lacks the support of substantial evidence. After WPC repeatedly raised concerns about the commercial illegitimacy of the Habich/[        ] relationship, Commerce cited only one piece of evidence in response: "In [        ] capacity as a domestic [              ], it supplements Habich's direct communication with [                              ]." **PR68** and **CR166** at 4. This so-called evidence that Commerce cites is a conclusory and self-serving statement by Habich in its questionnaire response. But conclusory, self-serving statements do not constitute substantial evidence. *Staub Design, LLC v. Carnivale*, 625 F. App'x 993, 996 (Fed. Cir. 2015) (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1295 (Fed. Cir. 2014)) ("{S}elf-serving statements do not constitute substantial evidence.")); *see Bridgestone Americas, Inc. v. United States*, 636 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2009) (finding lack of substantial evidence where "the only evidence on the record that could support Commerce's determination" was a "conclusory" statement).

Moreover, Commerce minimized significant evidence that ran counter to its conclusion. As discussed above, Commerce refused to collect evidence that would have shed light on the relationship between Habich and [        ]. But Commerce "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts*, 890 F.3d at 346; *see also Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 963 (D.C. Cir. 2003) (holding that agency

---

supplier relationship. 366 F. Supp. 2d at 1299. But that is only half the issue here. Evidence shows that Habich and [        ] are both [        ] co-dependent on each other.

could not rely on a "clipped view of the record" to support its conclusion); *see Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1140 (D.C. Cir. 2000) ("{E}vidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account.").

Specifically, significant record evidence shows an operational relationship between Habich and [     ] marked by [                    ]: [     ] of Habich's sale of strontium chromate into the U.S. involves [     ]—and [               ] purchases of strontium chromate come from Habich. **PR54** and **CR148** at 7. Indeed, the record shows that there are a total of [     ] transactions, out of which [     ] transactions are direct sales to [     ] and the remaining [     ] are sales where [     ] acted as a [                ]. *Id.* Evidence further shows that Habich and [     ] have an embedded and deep relationship that has gone on for 20 years, and by Habich's own admission the relationship was not based on normal written agreement but instead was based upon "mutual trust." **PR49** at 4. Commerce's findings run contrary to this significant evidence, which Commerce downplayed to reach its desired and predetermined conclusion.

In sum, Commerce failed to meet its legal duty to conduct a diligent inquiry and truly investigate the relationship between Habich and [     ]. As a result, Commerce's determination of no affiliation suffers from glaring flaws. Commerce's memoranda lack rational reasoning, and its conclusions are arbitrary and capricious, unsupported by substantial evidence, and thus contrary to law.

**B.    Commerce's determination to use third country sales from Mexico is unsupported by substantial evidence and not in accordance with law.**

**1.    Background on third country sales and "ordinary course of trade"**

Normal value is ordinarily computed by looking to the sales price of the subject merchandise in the exporting country, the home market. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). "If Commerce determines that the home market is non-viable," however, "the statute directs Commerce to use third country sales as the basis for {normal value}." *Alloy Piping Prod., Inc. v. United States*, 201 F. Supp. 2d 1267, 1274 (Ct. Int'l Trade 2002), *aff'd sub nom. Alloy Piping Prod., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284 (Fed. Cir. 2003) (citing 19 U.S.C. § 1677b(a)(1)(C)).

Third country sales, like home country sales, must be "in the ordinary course of trade." *Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1262 (Ct. Int'l Trade 2021), *aff'd,* 42 F.4th 1372 (Fed. Cir. 2022) ("The 'normal value' of the merchandise may be based upon home market or third-country sales that are made in the ordinary course of trade, or constructed value."). "Ordinary course of trade" means "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). "The Secretary may consider sales or transactions to be outside the ordinary course of trade if the Secretary determines, based on an evaluation of all of the circumstances particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(35). "Examples of sales that the Secretary might consider as being outside the ordinary course of trade

are sales or transactions involving off-quality merchandise or merchandise produced according to unusual product specifications, merchandise sold at aberrational prices or with abnormally high profits, merchandise sold pursuant to unusual terms of sale, or merchandise sold to an affiliated party at a non-arm's length price." *Id.*

>    2.    **Commerce ignored evidence and argument that Habich's sales in Mexico were not "in the ordinary course of trade" and not "representative"**

Commerce's determination to use Mexico as a third country comparison market to calculate normal value is arbitrary and capricious and contrary to evidence. Instead, Commerce should have used constructed value as required by statute.

WPC produced evidence to show that Habich's sales in Mexico were neither "in the ordinary course of trade" nor "representative," and thus could not serve as third country sales. *Cf.* 19 U.S.C. § 1677b(a)(1)(B)(ii)(I); *Alloy Piping Prod., Inc. v. United States*, 201 F. Supp. 2d at 1276. The evidence shows that Habich has no viable sales *to Mexico* as such. Instead, its sales to Mexico are all part of sales to a [

]. Obviously, sales that are partially to the U.S. cannot serve as a comparison market for purposes of calculating normal value.

Specifically, Habich admitted that it does not separately [

] in the United States and Mexico. **PR54** and **CR148** at 10. The email and sales negotiation documents on the record of this case submitted by Habich at Exhibits SC-07a, SC- 07b, and SC-07c to [                                    ] respectively all have notations which clearly reference a [

]. *Id.*

Based on the information submitted, it is apparent that the market to which Habich is selling constitutes the [                    ] of the United States and Mexico. *Id.* at 10-11. In fact, Habich readily admits that it negotiates prices [

                    ]. **PR49**. Habich's supplemental ABCD response clearly demonstrates that all sales to [                              ] and that [

                    ] by Habich. **PR54** and **CR148** at 10. There is thus no basis upon which Commerce can reasonably rely on Mexico as a valid comparison market and calculate normal value in accordance with 19 U.S.C. § 1677b because it is not a separate and viable comparison market.

Commerce in its preliminary decision memorandum (affirmed in the final decision memorandum) and its Close Supplier Memorandum ignores the evidence and fails to respond to WPC's comments, thus flunking both the substantial evidence and arbitrary and capricious tests. The preliminary memo is conclusory on this point and thus fails the test of reasoned decisionmaking. **PR68** and **CR166** at 9; *see Al Ghurair Iron & Steel*, 65 F.4th at 1363; *Jindal*, 365 F. Supp. 3d at 1386. Despite explaining in detail why Habich's sales in Mexico are not in the ordinary course of trade and not representative, and thus cannot serve as viable comparison third country sales, WPC's comments go unresponded-to by Commerce. **PR68** and **CR166** at 8-10; **PR94** at 7-8; *see Invenergy Renewables*, 552 F. Supp. 3d at 1399; *Bloomberg*, 45 F.4th at 476–77. Commerce appears to miss the point of, or otherwise simply ignores, WPC's argument. S*ee Al Ghurair Iron & Steel*, 65 F.4th at 1363.

Further, Commerce's final decision memorandum reveals that it "relied on factors" it was "not intended it to consider," a hallmark of arbitrary decisionmaking. *SKF USA*, 630 F.3d at 1373 n.3. In the final memo, Commerce complains that "{WPC} has made a variety of allegations against Habich's sales to Mexico in every administrative review segment of this proceeding." **PR94** at 7. Commerce then goes on to recount WPC's comments and concerns from past administrative reviews and bemoans how WPC supposedly "repeats its previous allegations and arguments. *Id.* at 8. Unmistakably, Commerce is cross-referencing prior segments to influence its reasoning and decision in this review segment. But such reasoning is out of bounds. "{E}ach administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record." *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1327 (Ct. Int'l Trade 2021) (citation omitted). Thus, a party like WPC must raise all problems in every administrative review, and Commerce has an obligation to consider those comments afresh each time, based on the facts on the record of *that* segment. Commerce has no license to excuse itself from reasoned analysis based on the facts, arguments—and, apparently, frustration against petitioner WPC— from a separate proceeding.

Finally, Commerce's implication that WPC failed to meet "criteria" misinterprets the regulations. Commerce claims that WPC did not provide sufficient evidence that Habich's sales to Mexico met any of the "criteria" in 19 C.F.R. § 351.102(b)(35). **PR68** and **CR166** at 9; **PR94** at 4. Commerce's analysis is wrong. The regulation cited lists examples, not an exhaustive list of "criteria": "examples of sales that the

Secretary might consider as being outside the ordinary course of trade . . . ." Given that the regulations provide a non-exhaustive list of examples of instances which may render sales outside the ordinary course of trade, it stands to reason that Commerce cannot consider these mere examples to be specific, required criteria.

## VI.    CONCLUSION

The Court should vacate and remand the determination on review.

Respectfully submitted,

<u>/s/ Nithya Nagarajan</u>
Nithya Nagarajan
Jeffrey S. Neeley
Jamie L. Shookman
Joseph S. Diedrich
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue NW, Suite 1000
Washington, DC 20006
(202) 378-2334
nithya.nagarajan@huschblackwell.com

*Counsel for Plaintiff*

Dated: December 5, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the Court's word limitation requirement. The word count for the foregoing brief, as computed by Husch Blackwell's word processing system (Microsoft Word), is 8,680 words.

Dated:          December 5, 2024                    /s/ Nithya Nagarajan
                                                    Nithya Nagarajan

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LUMIMOVE, INC., DBA WPC TECHNOLOGIES, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) Before: The Honorable Joseph A. ) Laroski, Jr |
| Defendant, | ) ) Court No. 24-00105 |
| and | ) ) |
| HABICH GMBH, | ) ) |
| Defendant-Intervenor. | ) |

## <u>PROPOSED ORDER</u>

On consideration of the motions for judgment on the agency record filed by Lumimove, Inc. d/b/a WPC Technologies ("WPC"), Defendant and Defendant-Intervenor's response, and all other pertinent papers, it is hereby:

ORDERED that the motions filed by WPC is granted, and it is further

ORDERED that the final determination of the U.S. Department of Commerce ("Commerce") is set aside as unlawful, and it is further

ORDERED that Commerce's final determination is remanded for reconsideration in accordance with the Court's decision.

Dated: _____
New York, New York          _____
                            The Honorable Joseph A. Laroski, Jr., Judge