## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| LUMIMOVE, INC., d/b/a WPC TECHNOLOGIES, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Court No. 24-00105 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| HABICH GMBH, | ) ) |
| Defendant-Intervenor. | ) ) |

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the administrative record filed by plaintiff, responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's motion is DENIED.

ORDERED that the Department of Commerce's determination is affirmed in all respects.

ORDERED that judgment is entered in favor of the United States.


Dated: _____              _____

                                                                JUDGE

**NONCONFIDENTIAL VERSION**

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| LUMIMOVE, INC., d/b/a WPC TECHNOLOGIES, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Court No. 24-00105 |
| UNITED STATES, ) ) | |
| Defendant, ) ) | **NONCONFIDENTIAL VERSION**<br>**BPI on pages ii, 6, 8-19** |
| and ) ) | |
| HABICH GMBH, ) ) | |
| Defendant-Intervenor. ) ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:

JACK DUNKELMAN
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

BRITTNEY M. WELCH
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C., 20044
Tel.: (201) 616-3753
Email: brittney.welch@usdoj.gov

February 14, 2025

**NONCONFIDENTIAL VERSION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2.......................................................................... 1

    I.      Administrative Determination Under Review...................................................... 1

    II.     Issues Presented For Review ............................................................................... 1

STATEMENT OF FACTS...................................................................................................... 2

    I.      Legal Framework For The Determination Of Affiliated Suppliers ...................... 2

    II.     Legal Framework For The Use Of Third Country Sales....................................... 3

    III.    Administrative Proceedings.................................................................................. 5

SUMMARY OF THE ARGUMENT ...................................................................................... 9

ARGUMENT .........................................................................................................................10

    I.      Standard Of Review .............................................................................................10

    II.     Commerce's Determination That Habich Is Not Affiliated With ████ Is Supported By Substantial Evidence And In Accordance With Law .....................10

    III.    Commerce's Determination To Use Third Country Sales From Mexico As A Comparison Market Is Supported By Substantial Evidence And Is In Accordance With Law .........................................................................................................18

CONCLUSION.......................................................................................................................21

**NONCONFIDENTIAL VERSION**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Al Ghurair Iron & Steel LLC v. United States,*
    65 F.4th 1351 (Fed. Cir. 2023) ...................................................................... 19, 20

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ........................................................................10

*Coal. of Am. Flange Producers v. United States,*
    448 F. Supp. 3d 1340 (CIT 2020) ....................................................................14

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ..........................................................................................10

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ..........................................................................10

*Hontex Enterprises, Inc. v. U.S.,*
    342 F. Supp. 2d 1225 (CIT 2004) .......................................................... 12, 13, 17

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984) ..........................................................................10

*Mid Continent Steel & Wire, Inc. v. United States,*
    203 F.Supp.3d 1295 (CIT 2017) .......................................................................17

*NSK Ltd. v. United States,*
    245 F. Supp. 2d 1335 (Ct. Int'l Trade 2003) .......................................................2

*Samsung Elecs. Co. v. United States,*
    70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) .........................................................3

*TIJID vs. United States,*
    366 F. Supp. 2d 1286 (CIT 2005) ...........................................................*passim*

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ..........................................................................................10

*Vicentin S.A.I.C. v. United States,*
    503 F. Supp. 3d 1255 (Ct. Int'l Trade 2021), *aff'd*, 42 F.4th 1372 (Fed. Cir. 2022)..................4

NONCONFIDENTIAL VERSION

## STATUTES

19 U.S.C. § 1516(a)(b)(1)(B) ................................................................10

19 U.S.C. § 1677(15) ...........................................................................4

19 U.S.C. § 1677(33) .....................................................................*passim*

19 U.S.C. § 1677b............................................................................2, 4

## REGULATIONS

19 C.F.R. § 351.102 .......................................................................*passim*

19 C.F.R. § 351.404 ...........................................................................4

## FEDERAL REGISTER NOTICES

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea,*
   *62 Fed. Reg. 18,404 (D*ep't of Commerce April 15, 1997)......................................17

*Strontium Chromate From Austria and France: Antidumping Duty Orders,*
   84 Fed. Reg. 65,349 (Dep't of Commerce January 3, 2023)................................... 5

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping*
*Duty Administrative Review; 2017-2018,*
   85 Fed. Reg. 10,411 (Dep't of Commerce February 24, 2020) ...............................13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   88 Fed. Reg. 50 (Dept. of Commerce January 18, 2023)....................................... 5

*Strontium Chromate From Austria: Preliminary Results of Antidumping Duty Administrative*
*Review; 2021-2022,*
   88 Fed. Reg. 84,777 (Dept. of Commerce November 29, 2023)............................... 8

*Strontium Chromate From Austria: Final Results of Antidumping Duty Administrative Review;*
*2021-2022,*
   89 Fed. Reg. 44,631 (Dep't of Commerce May 21, 2024)....................................1, 9

## RULES

Rule 56.2.............................................................................................. 1

NONCONFIDENTIAL VERSION

Defendant, the United States, respectfully responds in opposition to the motion for judgment on the administrative record filed by plaintiff, Lumimove, Inc. d/b/a WPC Technologies (WPC), challenging two aspects of the Department of Commerce's final results in the third administrative review of the antidumping duty order covering strontium chromate from Austria.  Commerce's conclusion that Habich was not affiliated with its United States sales agent, and Commerce's decision to use third country sales from Mexico as a comparison market, are both supported by substantial evidence and are otherwise in accordance with law.  Therefore, the Court should deny the motion and enter judgment for the defendant.

## <u>STATEMENT PURSUANT TO RULE 56.2</u>

**I.     Administrative Determination Under Review**

The administrative determination under review is *Strontium Chromate From Austria: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 44,631 (Dep't of Commerce May 21, 2024) (*Final Results*) (P.R. 95),[1] and the accompanying Issues and Decision Memorandum (IDM) (Dep't of Commerce May 14, 2024) (P.R. 94).

**II.    Issues Presented for Review**

1.  Whether Commerce's determination that Habich and its United States sales agent are not affiliated is supported by substantial evidence and in accordance with law.

2.  Whether Commerce's determination to use third country sales from Mexico as a comparison market is supported by substantial evidence and in accordance with law.

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the antidumping duty review.

NONCONFIDENTIAL VERSION

## STATEMENT OF FACTS

### I.    Legal Framework for the Determination of Affiliated Suppliers

If Commerce determines that a foreign like product is sold at a price less than the cost of production, Commerce may disregard below-cost sales in its calculation of normal value.  19 U.S.C. § 1677b(b)(1).  Section 1677b(f)(2) further provides that, for purposes of calculating the cost of production, Commerce may disregard an affiliated party transaction where the amount representing the transaction "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the home market."  19 U.S.C. § 1677b(f)(2).  In other words, Commerce may disregard affiliated party transactions where the cost of the input supplied by the affiliate is not at "arms-length."  *NSK Ltd. v. United States*, 245 F. Supp. 2d 1335, 1341 (Ct. Int'l Trade 2003) (citing 19 U.S.C. § 1677b(f)(2)).  Thus, Commerce must determine whether a respondent's suppliers are affiliated as a part of calculating the normal value of subject merchandise.

The antidumping statute provides that "{a}ny person who controls any other person and such other person" shall be considered "affiliated."  19 U.S.C. § 1677(33)(G).  The statute further provides that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  19 U.S.C. § 1677(33).  Commerce's regulations explain that "{i}n determining whether control over another person exists . . . {Commerce} will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and *close supplier relationships*."  19 C.F.R. § 351.102(b)(3) (emphasis added).  Additionally, Commerce "will not find that control exists on the basis of these factors unless the relationship has the

potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id.*

Close supplier relationships are defined by the Statement of Administrative Action as those in which "the supplier or buyer becomes reliant upon the other." Statement of Administrative Action Accompanying H.R. Doc. No. 316, 103rd Congress, 2d Session (1994) at 838 (SAA). While there is no specified statutory or regulatory standard for determining whether the supplier or buyer is reliant upon the other, this Court has held that a close supplier relationship is established "when a party demonstrates that the relationship is significant and could not be easily replaced." *TIJID vs. United States*, 366 F. Supp. 2d 1286, 1295-1300 (Ct. Int'l Trade 2005).

Commerce conducts a two-step analysis for determining affiliation based on a close supplier relationship. *TIJID*, 366 F. Supp. 2d at 1299. First, Commerce evaluates whether the supplier or buyer has" become reliant on the seller." *Id. Only if* Commerce determines that there is reliance does it then evaluate whether one of the parties is in a position to exercise restraint or direction over the other relating to the subject merchandise. *Id.* (sustaining Commerce's finding that no close supplier relationship existed even though supplier sold 100 percent of its product to the respondent, as there was no evidence the supplier was required to do so); *Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1357 (Ct. Int'l Trade 2015) ("Not all close supplier relationships are control relationships, however{,}" a supplier and buyer are affiliates only when one "'becomes *reliant* upon the other.'") (emphasis in original).

## II.    Legal Framework for the Use of Third Country Sales

Typically, the normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the

ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price{.}" 19 U.S.C. § 1677b(a)(1)(B)(i).  However, 19 U.S.C. § 1677b directs Commerce not to use the price in the exporting country as a basis for calculation in certain circumstances.  If Commerce "determines that the aggregate quantity . . . of the foreign like product in the exporting country is insufficient to permit a proper comparison," Commerce shall normally look to sales from a third country. 19 U.S.C. § 1677b(a)(1)(C)(ii); *see also* 19 C.F.R. § 351.404(f).  Normal value may also be based upon constructed value where it cannot be based on prices in the exporting country.  19 U.S.C. § 1677b(a)(4).  The statutory provision directing use of third country sales specifically explains that the aggregate quantity of foreign like product sold in the exporting country is normally insufficient for purposes of determining normal value if it "is less than 5 percent of the aggregate quantity . . . of sales of the subject merchandise to the United States."  *Compare* 19 C.F.R. § 351.404(b)(2) *to* 19 U.S.C. § 1677b(a)(1)(C) (the former stating that 5 percent or more is normally sufficient and the latter stating that less than 5 percent is insufficient.).

Third country sales, like home country sales, must be "in the ordinary course of trade." *Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1262 (Ct. Int'l Trade 2021), *aff'd*, 42 F.4th 1372 (Fed. Cir. 2022) ("The 'normal value' of the merchandise may be based upon home market or third-country sales that are made in the ordinary course of trade, or constructed value.").  "Ordinary course of trade" means "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15).  Commerce "may consider sales or transactions to be outside the ordinary course of trade if {Commerce} determines, based on an evaluation of all of the circumstances particular to the

sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(35). "Examples of sales that {Commerce} might consider as being outside the ordinary course of trade are sales or transactions involving off-quality merchandise or merchandise produced according to unusual product specifications, merchandise sold at aberrational prices or with abnormally high profits, merchandise sold pursuant to unusual terms of sale, or merchandise sold to an affiliated party at a non-arm's length price." *Id.*

### III.    Administrative Proceedings

Commerce has published an antidumping duty order covering strontium chromate from Austria. *Strontium Chromate from Austria and France: Antidumping Duty Orders*, 84 Fed. Reg. 65,349. On January 3, 2023, Commerce initiated the third administrative review of the order for the period of November 1, 2021 to October 31, 2022. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 50 (Dep't of Commerce Jan. 3, 2023) (P.R. 5). Commerce initiated review of one company, Habich GmbH (Habich). *Id.* at 52.

Commerce issued its initial antidumping duty questionnaire to Habich on January 18, 2023. Request for Information (Dep't of Commerce) (P.R. 11) (Habich Questionnaire). Habich reported to Commerce that it did not sell any in-scope products in its home market of Austria. Habich GmbH's Home Market Viability Notification (P.R. 12) (Habich Letter). Habich filed its Section A questionnaire response, related to organization, accounting practices, markets, and merchandise. Habich GmbH's Section A Questionnaire Response (P.R. 13-14, C.R. 3-4).

Subsequently, domestic petitioner WPC filed deficiency comments. WPC argued that Habich filed to provide third country sales data, incorrectly reported non-market economy sales, and failed to provide sample sales documentation for all three channels of trade to the United

States.  Petitioner's Initial Deficiency Comments on Habich's Section A Response at 2, 5 (P.R. 18, C.R. 5).  Habich filed rebuttal comments, stating that Habich correctly reported its viable third-country markets, that it intended to report its sales to Mexico for calculation of normal value, and that it provided sample sales documentation for all Unites States channels.  Habich GmbH's Response to Petitioner's Deficiency Comments on Habich's Section A Response at 2, 4, 6 (P.R. 19, C.R. 6).

Habich then filed its section B-D questionnaire responses.  Habich GmbH's Section B, C, & D Questionnaire Responses (P.R. 24-26, C.R. 7-75) (Habich's IQR-B).  As relevant here, in its Section C response, Habich reported that it maintains an unaffiliated commercial relationship with a United States distributor and commissioned sales agent, ███████████████████ ████.  Habich GmbH's Section C Questionnaire Response at C-44 to C-45 (P.R. 24, C.R. 7).

WPC requested that Commerce conduct verification of Habich's questionnaire responses.  Request to Verify Habich's Questionnaire Responses (P.R. 32) (Verification Request).  WPC then filed deficiency comments regarding Habich's initial questionnaire responses and alleged that Habich is affiliated with one of its United States customers under section 771(33)(G) of the Act of 1930 and 19 C.F.R. § 351.102(b)(3).  *See* WPC's Rebuttal Comments and New Factual Information Response (P.R. 34, C.R. 78).  Specifically, WPC alleged, without evidence, that "there is clearly a close supplier relationship between Habich and ██████ such that Habich has the ability to exercise significant control over the pattern and pricing of sales by and through ██████ which remains unexplained on the record."  *Id.* at 3.  WPC stated further, without evidentiary support, that ██████ acts as both distributor and commissioned sales agent, in a "convoluted" relationship that "does not make sense on its face{.}"  *Id.* at 7-10.  WPC also broadly questioned Habich's sales to Mexico.  *Id.* at 2.

In rebuttal, Habich stated that WPC's comments "are a collection of unsupported allegations and factual inaccuracies," and did not address the allegation of a close supplier relationship because WPC's "statements are simply no longer reliable."  Habich GmbH's Response to Petitioner's Rebuttal Comments and New Factual Information at 2-3 (P.R. 39, C.R. 79).  WPC submitted surrebuttal comments, stating that Commerce needed to further investigate "pricing vagaries" because of the "significant and sustained gap" in pricing.  Reply to Habich's Response to WPC's Rebuttal Comments and New Factual Information Response at 3 (P.R. 40, C.R. 80).

Subsequently, Commerce issued its first supplemental questionnaire, Sections A-D Supplemental Questionnaire at 4-5 (Dep't of Commerce) (P.R. 42, C.R. 81), asking multiple questions about Habich's relationship with ▮▮▮▮, to which Habich responded.  *See* Habich GmbH's Sections A-D 1st Supplemental Questionnaire Response at 1-8 (P.R. 49, C.R. 82-147) (Habich's SQR1).  WPC then filed deficiency comments regarding Habich's supplemental responses, stating that Commerce had not fully examined the extent of Habich's close supplier relationships, and that Habich's reported sales to Mexico did not occur in the ordinary course of trade.  *See* Deficiency Comments on Habich Supplemental ABCD Questionnaire Response at 2-4, 10 (September 5, 2023) (P.R. 54, C.R. 148).  In Habich's filed rebuttal comments, Habich stated that WPC's allegation that Habich "created a fictitious market in Mexico" is unfounded.  Habich GmbH's Factual Information to Rebut, Clarify, or Correct Petitioner's Fictitious Market Allegation at 2, 4 (September 7, 2023) (P.R. 55, C.R. 149).

Commerce then issued a second supplemental questionnaire related to sales and expenses, Sections C and D Supplemental Questionnaire (Dep't of Commerce) (P.R. 56, C.R.

150), to which Habich responded.  Response to Antidumping Questionnaire: Supplemental

Sections C and D (P.R. 63, C.R. 151-64).

Commerce published the preliminary results of this administrative review on December

6, 2023.  *See Strontium Chromate From Austria: Preliminary Results of Antidumping Duty

Administrative Review; 2021-2022*, 88 Fed. Reg. 84,777 (Dep't of Commerce) (*Preliminary

Results*) (P.R. 74), and accompanying Preliminary Decision Memorandum (Dep't of Commerce)

(November 29, 2023) (PDM) (P.R. 68).  Commerce preliminarily determined that Austria's home

market was not viable as a comparison market, and used Habich's sales to a third country,

Mexico, as the basis for normal value (NV).  PDM at 8-9.

Commerce also issued a supplemental memorandum discussing Habich's relationship

with a United States distributor and commissioned sales agent.  Close Supplier Relationship and

Comparison Market Sales Analysis (Nov. 30, 2023) (Close Supplier Memorandum) (P.R. 69,

C.R. 166).  Commerce's preliminary finding was that, while Habich maintained a commercial

relationship with ███, that relationship did not rise to the level of "reliance" for the purposes

of finding affiliation through control under 19 U.S.C. § 1677(33)(G).  Close Supplier

Memorandum at 2-8.  In particular, Commerce found that there was no exclusive selling

agreement between the two companies, no evidence that ███ could not acquire subject

merchandise from other sources, and no evidence that Habich could not use another sales agent

or distributor if it chose to do so.  *Id.* at 4-8.

Commerce conducted verification of Habich's questionnaire responses in Austria.  *See*

Verification of the Sales Response of Habich GmbH in the Third Antidumping Duty

Administrative Review of Strontium Chromate from Austria (Dep't of Commerce) (March 1,

2024) (Verification Report) (P.R. 84, C.R. 268).  Subsequently, the parties submitted their

administrative case briefs.  WPC argued that Commerce "abdicated" its responsibility to discern the relationship between Habich and ██████ and ignored WPC's comments related to Habich's sales in Mexico, failing to conduct an ordinary course of trade analysis.  Case Brief On Behalf of WPC Technologies at 2-13 (WPC) (P.R. 88, C.R. 269).  In its rebuttal brief, Habich argued that Commerce correctly determined that Habich and ██████ are not affiliated companies, and that record evidence demonstrates that Habich's sales to Mexico occurred in the ordinary course of trade.  Habich GmbH's Rebuttal Brief at (Mar. 28, 2024) (P.R. 92, C.R. 270).

On May 21, 2024, Commerce published its final results.  *See Final Results*, 88 Fed. Reg. 44,631 (P.R. 95), and accompanying IDM (May 14, 2024) (P.R. 94).  Commerce continued to find that Habich and ██████ were not affiliated through a close supplier relationship, finding no discrepancies in the record as to the relationship between the two.  IDM 3-6.  Additionally, Commerce continued to use Habich's sales to Mexico to calculate normal value, determining those sales were within the ordinary course of trade.  *Id.* at 6-9.

## SUMMARY OF THE ARGUMENT

Commerce's determination that Habich and ██████, Habich's United States sales agent and distributor, are not affiliated, is lawful and supported by substantial evidence.  After conducting a comprehensive inquiry into the relationship between Habich and ██████, including onsite verification of Habich, the robust record did not indicate that Habich and ██████ became reliant on each other.  As such, Commerce correctly determined that the two companies were not affiliated by virtue of a close supplier relationship.

Commerce's use of Mexico as a third country comparison market is also supported by substantial evidence and in accordance with law.  Habich's home market sales were not viable, so Commerce looked to Mexico as a comparison market.  Despite WPC's contentions, Habich's

sales to Mexico were made with the same methods employed for its sales to other countries, including the United States, and were within the ordinary course of trade.

Commerce's determinations were supported by substantial evidence and are in accordance with law, and the final results should be sustained.

## **ARGUMENT**

## I.    **Standard of Review**

In reviewing Commerce's antidumping determinations, this Court sustains "'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (citing 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" is "more than a mere scintilla" of relevant and reasonable evidence, *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (citation omitted).

## II.   **Commerce's Determination That Habich Is Not Affiliated With ███ Is Supported By Substantial Evidence And In Accordance With Law**

After considering all of the relevant factors under the statute, 19 U.S.C. § 1677(33), and the regulation, 19 C.F.R. § 351.102(b)(3), Commerce found that Habich was not affiliated with ███ in a close supplier relationship.  IDM 3-6.  Commerce examined the business relationship

and made a finding supported by substantial evidence.  WPC's assertion that Commerce did not conduct a thorough investigation is merely unsupported speculation.

WPC's first argument revolves around its allegations that Commerce "sat on the sidelines," conducted a "meager" investigation, failed to examine the "commission" relationship between Habich and ▮▮▮, and merely accepted conclusory statements from Habich.  Pl. Br. 2-3, 15-17, 24.  These arguments run counter to the record.  WPC spends several pages outlining the legal precedent for Commerce's "obligation to investigate," but this discussion misses the point.  Pl. Br. at 15-18.  Commerce *did* thoroughly examine WPC's claims that Habich and ▮▮▮ had a relationship of reliance.

Through initial questionnaires and two rounds of supplemental questionnaires, Commerce posed more than 70 questions to Habich, some of which were suggested by WPC itself with regard to the relationship between Habich and ▮▮▮.  *See* Sections A-D Supplemental Questionnaire at 4-5 (Dep't of Commerce) (P.R. 42, C.R. 81); WPC's Rebuttal Comments and New Factual Information Response at 5-10 (P.R. 34, C.R. 78);  IDM at 3-4.  At WPC's request, Commerce conducted onsite verification in Austria to follow up on and confirm Habich's responses.  Verification Request; Verification Report.  Commerce officials met with Habich personnel involved in sales and interactions with ▮▮▮ and other distributors, reviewed internal documents and email communications between Habich and ▮▮▮, and evaluated the reliability of Habich's record submissions.  IDM at 4 (citing Verification Report at 3-7; Exhibits VE-II and VE-III (C.R. 179-82)).  Commerce found no evidence at verification that contradicted information reported by Habich on which Commerce based its preliminary determination that there was no close supplier relationship between Habich and ▮▮▮.  *Id.*

Under the first prong of Commerce's close supplier analysis, Commerce evaluated whether either the supplier or buyer had become reliant on the other.  Commerce found that the sum of the interactions between Habich and ███, which acts as Habich's distributor of subject merchandise and sales agent for the United States, did not rise "to the level of 'reliance' for the purposes of finding affiliation through control under {19 U.S.C. § 1677(33)(G)}."  Close Supplier Memorandum at 4-5, 8 (citing SAA at 838 (defining a close supplier relationship as one in which the "supplier or buyer becomes reliant on each other.")); IDM at 4; *see also TIJID*, 366 F. Supp. 2d at 1293-95; *Hontex Enterprises, Inc. v. U.S.*, 342 F. Supp. 2d 1225, 1241-43 (CIT 2004).  In its analysis, Commerce considered the fact that evidence did not show that ███ was required to import strontium chromate only from Habich, that the parties had an exclusive selling arrangement, or that ███, if it wished, would have difficulty obtaining strontium chromate from other suppliers during the period of review.  Close Supplier Memorandum at 5.

WPC asserts that Commerce failed to adequately investigate Habich's close ties with ███ and states that Habich's assertion that it did not maintain an exclusive seller contract with ███ does not withstand scrutiny.  Pl. Br. at 22.  However, Commerce sufficiently probed the relationship between Habich and ███ through its first supplemental questionnaire, and as stated, did not find evidence of an exclusive supplier agreement that would be binding on the parties.  Sections A-D Supplemental Questionnaire at 4-5; IDM at 6.  In its questionnaire response, Habich explained that it maintained ███████████████



███.  Habich's SQR1 Section C Response at Exhibit C-13 (C.R. 7).  Additionally, Habich and ███ maintained a written commission agreement and Habich also provided written price lists to ███ during the POR.  *See* Habich's SQR1 at 4-5 and Exhibit SA-03; Habich GmbH's

Section A Questionnaire Response at Exhibit A-6.  The Court has sustained Commerce's finding

of non-affiliation under similar facts.  *See TIJID*, 366 F. Supp. 2d at 1299.  Contrary to WPC's

claims that Commerce did not sufficiently examine the relationship between Habich and ███,

over the course of five days of onsite verification, Commerce confirmed ████████████████

█████████████████████████.  Verification Report at 6; VE-IV-1A through VE-

IV-V (C.R. 226-33).

Furthermore, there is no record evidence to suggest that ███ could not obtain or would

have difficulty in obtaining strontium chromate from other suppliers during the period of review,

including WPC itself, if it wanted to.  To the contrary, Habich stated in its questionnaire

responses that "there is no agreement or prohibition in place that would preclude ███ from

selling strontium chromate from the French producer SNCZ, or the U.S. producer, WPC

Technologies."  SQR1 at 5-6.  In *Chlorinated Isos from China*, Commerce stated that "{a} party

might have an exclusive relationship with a supplier, customer, or reseller, but still be perfectly

capable of acting independently if the exclusive relationship is no longer in its interests.  What

matters is whether the first party ultimately has other options and thus is not by necessity in the

exclusive relationship with the second party."  *See Chlorinated Isocyanurates from the People's

Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR

10,411 (February 24, 2020), and accompanying IDM at Comment 1; *see also Hontex*, 342 F.

Supp. 2d at 1243.  There was no evidence on the record that ███ did not have "other options"

from which it could procure strontium chromate.  In fact, in its own submission, WPC lists two

other companies, including itself, as producers of strontium chromate.  WPC's Rebuttal

Comments and New Factual Information Response at 7.  Additionally, there was no indication

that Habich could not use another sales agent or distributor if it wanted to, instead of ███.

Habich's SQR1 at 5; Verification Report at 6.  In sum, there is no agreement that makes the relationship between Habich and ████ exclusive, legally or functionally.

WPC attempts to characterize Habich and ████ relationship as one not based on normal written agreements and faults Commerce for not sufficiently investigating Habich's role in setting prices for ████ downstream customers.  Pl. Br. at 21-22; 25-26.  Despite WPC's criticism that Commerce didn't sufficiently query for information with the specific wording it preferred, *Id.* at 20-21,[2] the record demonstrates that Commerce issued supplemental questionnaires probing the relationship between Habich and ████ and verified Habich's responses during five-day onsite verification, finding no discrepancies or omissions in its reporting.  Habich's SQR1 at 4-5; Verification Report at 3-14.  Habich provided written price lists, which include ████████████████████████████████████████████ ████████████████████████████████.  Close Supplier Memorandum at 6.  The record shows that Habich had notified ████████████████████████████ suggesting that ████ does not receive special consideration in relation to Habich's other customers with respect to sales and distribution.  *Id.*; Habich GmbH's Section A Questionnaire Response at Exhibit A-6.  Furthermore, the record shows that where ████ acts as a distributor, downstream customers order directly from ████, Habich is not involved in setting prices, and does not otherwise have direct knowledge of the pricing or other sales terms.  Habich's SQR1 at 6; Verification Report 4.  Where ████ acts in its capacity as sales agent for Habich, Habich

---

[2]  WPC argues that this case stands in contrast to *Coalition of American Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1357 (Ct. Int'l Trade 2020), because WPC has "identified the specific information that Commerce should have solicited."  Pl. Br. at 21 n.1. But, as discussed, Commerce *did* seek out the information WPC requested.  "Commerce fulfilled its duty of conducting a diligent inquiry, and was not required to do more{.}"  *Flange Producers*, 448 F. Supp. 3d at 1357.

itself negotiates prices with its customers regarding pricing, quantity, and all other sales terms. Habich's SQR1 at 2, 6-7, 10, and Exhibits SA-11.1-11.3.

WPC asserts that Habich insufficiently answered Question 8 in Commerce's supplemental questionnaire, Pl. Br. at 22, "Discuss whether Habich is ██████'s only supplier of strontium chromate and whether Habich sells other products besides strontium chromate to ████." Sections A-D Supplemental Questionnaire at 5. Commerce found that Habich provided a full answer. Habich stated that it did not have an exclusive sales or distributor agreement with ████ and further, that Habich did not have knowledge of whether ████ sells strontium chromate not produced by Habich, and that Habich also sells products other than strontium chromate to ████. Habich's SQR1 at 7-8. Even if Habich is the only seller of strontium Chromate to ████, as discussed, there is no evidence of an exclusive buying arrangement nor is there evidence indicating a lack of other sources of subject merchandise. Substantial evidence supports Commerce's conclusion that there was no reliance that would rise to the level of a close supplier relationship.

WPC questions how the commission arrangement in which ████ acts as a selling agent for Habich is "necessary or commercially reasonable{,}" and argues that Commerce is "confused" by the Habich/████ relationship. Pl. Br. at 18-20; 25-26. Specifically, WPC claims that because Habich has preexisting relationships with certain global end users, it has no reasons to rely on ████ as a sales agent. Pl. Br. at 18-19. However, Habich explained in its questionnaire responses why ████ acts as its sales agent. ████ acts as a sales agent for Habich to supplement Habich's direct communication with these customers and to help maintain those customer accounts. Habich's SQR1 at 2. With these accounts, Habich "negotiates directly regarding pricing, quantity, and all other sales terms." *Id.* At verification, Habich officials

further explained that ███████████ customer relationships for Habich ███████████

███████████████████████████████████ in exchange for ███████████████

███████████████████████████████████. Verification Report at

4. Company officials additionally stated that Habich uses ███████████████

█████████████████████████████████████████████████

███████████████████████. *Id.*

WPC's second argument related to Commerce's close supplier analysis is that Commerce

failed to consider the "operational" relationship between Habich and ████. Pl. Br. at 26-27

(citing 19 U.S.C. § 1677(33)(G) (indicating that control involves being legally or operationally in

a position to exercise restraint or direction over another person)). However, as discussed above,

and as WPC itself recognizes, under the first step of the close supplier relationship, Commerce

determined that there was no reliance whether legally or operationally. Pl. Br. at 24, n.3. As

such, Commerce was not required to further analyze whether parties can exercise restraint or

direction because the evidence did not establish that Habich and ████ became reliant on each

other. *See* Close Supplier Memorandum at 5, 8.

Further, contrary to WPC's contention, Commerce analyzed and discussed key aspects of

the operational relationship between Habich and ████, including the lack of any legal or

functional exclusivity arrangements and the lack of influence over pricing between Habich and

████. IDM at 3-6; Close Supplier Memorandum at 3-8. WPC's contention that the fact that

███████ of Habich's sales of strontium chromate into the United States involved ████ and

that ████████████ purchases of strontium chromate come from Habich establishes

reliance between ████ and Habich is incorrect. Pl. Br. at 27-29. The fact that a supplier sells

100 percent of its exports to a distributor does not alone demonstrate a close supplier

relationship. *TIJID*, 366 F. Supp. 2d at 1299.  In *TIJID*, the Court found that even where a Chinese supplier sold 100 percent of its United States imports to a specific importer, that fact alone did not establish a close supplier relationship.  *Id.*  There was no evidence in *TIJID*, such as documentation reflecting an exclusive selling arrangement, that showed the United States importer was required to import subject merchandise solely from the Chinese supplier.  *Id.*  The Court in *TIJID* observed that the plaintiff "{hung} its hat" merely on the close "brotherly" relationship between the CEOs of the two companies, and that Commerce's determination of no close supplier relationship was supported by substantial evidence.  *Id*; *see also Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1303 (Ct. Int'l Trade 2017).

Here, WPC hangs its "hat" on the same hook.  Like in *TIJID*, and contrary to WPC's assertions, in this review, there is no record evidence that indicates ████ was required to import strontium chromate solely from Habich.  IDM at 5.  WPC states that this case differs from *TIJID* because evidence shows that Habich and ████ are ████ co-dependent, but this is incorrect. Pl. Br. at 27-28 n.4.  In fact, there is no record evidence of any exclusive selling arrangement between ████ and Habich, nor is there evidence that ████ is obliged to purchase any amount of subject merchandise.  Close Supplier Memorandum at 4; SQR1 at 5-6; Verification Report at 6.  Even if the facts of the relationship between the parties rose to the level of exclusive supplier arrangement (and they do not), even exclusive selling contracts on their own are insufficient to show affiliation.  *See Hontex*, 342 F. Supp. 2d at 1243.  Rather, "exclusive sales contracts" "are a common commercial arrangement all over the world," "typically made at arm's length and do not normally indicate control of one party over the other.  *Id*. (citing *Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea,* 62 Fed. Reg. 18,404, 18,441 (Dep't of Commerce Apr. 15, 1997) (final results)).

WPC's final argument is that Commerce's determination is unsupported by substantial evidence. Pl. Br. at 28-29. As discussed above, Commerce did not only rely on "one piece of {self-serving} evidence." *Id.* Commerce relied upon Habich's responses to initial and supplemental questionnaires, as well as conducted onsite verification in Austria. IDM at 3-4; Verification Request; Verification Report. Nor did Commerce "minimize significant evidence{.}" Pl. Br. at 28-29. Instead, Commerce reasonably and lawfully concluded that the fact that ███ of Habich's sales in the United States involved ███ did not alone show a close supplier relationship, and Commerce considered the other factors (import requirements, exclusivity) in making its determination that no such relationship existed. *See TIJID*, 366 F. Supp. 2d at 1299.

For these reasons, Commerce's determination that Habich and ███ are not affiliated by means of a close supplier relationship is supported by substantial evidence. Commerce considered all of the relevant factors and its determination should be affirmed.

### III. Commerce's Determination to Use Third Country Sales from Mexico as a Comparison Market is Supported by Substantial Evidence and is in Accordance With Law

WPC contends that Commerce's determination to use Mexico as a third country comparison market was arbitrary and capricious and contrary to evidence because Habich's sales in Mexico were not made in the ordinary course of trade, or were not representative, and therefore could not serve as third country sales. Pl. Br. at 31. WPC argues that instead, Commerce should have used constructed value to calculate normal value. *Id.* However, substantial evidence supports Commerce's determination that Habich's sales to Mexico were made in the ordinary course of trade. Habich's sales to Mexico were made using the same sales method used for its sales to other countries, including the United States. *Id.*

18

WPC alleges that Habich's sales to Mexico are merely part of a ███████████ ███████████ and further states that Habich does not separately ███████████ ███████████ in the United States and Mexico.  Pl. Br. at 31.  However, record evidence shows that Habich's sales to Mexico are distinct from its sales to the United States. ████ acts as Habich's distributor and sales agent for sales to the United States and does not provide sales agent services for Habich in Mexico.  PDM Supplement at 9; Habich's SQR1 at 6; Habich's IQR-B at Exhibit B-26.  Habich's ████ distributor in Mexico is ████, which handles ███████████ of both subject and non-subject merchandise for the Mexican market. Habich's SQR1 at 6.  Customers like ███████████████████ are handled directly by Habich.  *Id.*  At verification, Commerce officials examined documentation supporting Habich's sales to Mexico, including "price lists, invoices, and certificates of analysis."  IDM at 7; Verification Report at 6-7, 14-15; Verification Exhibits Part 11 at VE-IX (January 22, 2024) (C.R. 233).  This examination included the emails and sales negotiation documents WPC cites as having "notations" clearly referencing a ███████████████████.  Pl. Br. at 31-32.  The record shows that Habich is not affiliated with its customers and its ███████████████ are based on market forces.  Close Supplier Memorandum at 9-10.

WPC further alleges that Commerce excused itself from analyzing the facts on the record by failing to respond to WPC's comments, as well as by referring to WPC's comments on past reviews to influence its determination in this review.  Pl. Br. at 32-33.  WPC cites *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) to support its proposition that Commerce's examination of the issue was conclusory and ignores WPC's arguments.  *Al Ghurair* is distinguishable.  There, the Court was "unable to conclude that Commerce even

NONCONFIDENTIAL VERSION

considered" the plaintiff's argument, and that Commerce's discussion was "limited to a single paragraph that is vague and conclusory."  *Id.* at 1363.

This is not the case here.  Commerce repeatedly addressed WPC's arguments, along with providing examples as to why the record evidence supported Commerce's determination.  *See* PDM at 9; Close Supplier Memorandum at 9-10; IDM at 8.  Commerce considered the facts and arguments presented by WPC in *this* administrative review and conducted a reasoned analysis based on the record of *this* proceeding.  *See* PDM at 8-9 (discussing WPC's comments related to Habich's reporting of sales to Mexico, finding no support for WPC's claims "after a thorough examination of the documentation on the record" and "examining the totality of the circumstances particular to Habich's Mexican sales{.}"); Close Supplier Memorandum at 8-10 (finding "no evidence to support {WPC's} claims that Habich's sales to Mexico were outside the ordinary course of trade, 'artificial and a sham,' or otherwise unsuitable for use in the calculation of normal value{.}"); IDM at 6-8 ("{W}e continue {to} find that {WPC} did not provide sufficient evidence that Habich's sales to Mexico were outside the ordinary course of trade.").

Finally, WPC claims Commerce applied the wrong analysis in concluding that WPC did not provide sufficient evidence that Habich's sales to Mexico met any of the "criteria" in 19 C.F.R. § 351.102(b)(35).  Pl. Br. at 33.  WPC is mistaken.  The regulation provides in relevant part:

> Examples of sales that {Commerce} might consider as being outside the ordinary course of trade are sales or transactions involving off-quality merchandise or merchandise produced according to unusual product specifications, merchandise sold at aberrational prices or with abnormally high profits, merchandise sold pursuant to unusual terms of sale, or merchandise sold to an affiliated party at a non-arm's length price.

19 C.F.R. § 351.102(b)(35).

NONCONFIDENTIAL VERSION

Although the regulation provides illustrative examples of sales that Commerce might consider as being outside the ordinary course of trade, the regulation *also* requires sales or transactions to have characteristics that are "extraordinary for the market in question" to deem sales outside the ordinary course of trade. *Id.* As discussed above, WPC failed to identify anything extraordinary about Habich's Mexican sales, sales which were made using the same sales method Habich used for its sales to other countries, including the United States, albeit through a different local distributor.

For these reasons, Commerce's determination that Habich's sales to Mexico were in the ordinary course of trade is supported by substantial evidence.

## **CONCLUSION**

For these reasons, we respectfully request that this Court sustain Commerce's final results in their entirety and enter final judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Brittney M. Welch
BRITTNEY M. WELCH
JACK DUNKELMAN                          Trial Attorney
Of Counsel                              Department of Justice
                                        Civil Division
U.S. Department of Commerce             Commercial Litigation Branch
Office of the Chief Counsel for         PO Box 480, Ben Franklin Station
Trade Enforcement & Compliance          Washington, D.C. 20044
1401 Constitution Ave., NW              Tel.: (202) 616-3753
Washington, D.C. 20230                  Email: brittney.welch@usdoj.gov

February 14, 2025                       Attorneys for Defendant

**NONCONFIDENTIAL VERSION**

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,247 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Brittney Welch</u>
Brittney M. Welch