UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

LUMIMOVE, INC., DBA WPC
TECHNOLOGIES

Plaintiff,

v.

UNITED STATES,

    Defendant,

and

HABICH GMBH,

    Defendant-Intervenor.

Court No. 24-00105

NONCONFIDENTIAL VERSION

## DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Friederike S. Görgens
Matthew L. Kanna
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)
(202) 331-3101 (Fax)
*Counsel for Defendant-Intervenor Habich
GmbH*

March 7, 2025

NONCONFIDENTIAL VERSION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT PURSUANT TO RULE 56.2 .................................................................... 1

I.    ADMINISTRATIVE DETERMINATION UNDER REVIEW ........................................... 1

II.   ISSUES PRESENTED FOR REVIEW ............................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

SUMMARY ....................................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.    COMMERCE'S DETERMINATION THAT HABICH AND [      ] ARE NOT
      AFILIATED IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN
      ACCORDANCE WITH LAW ......................................................................................... 7

II.   COMMERCE'S DETERMINATION THAT MEXICO IS THE APPROPRIATE
      COMPARISON MARKET IS SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE
      AND OTHERWISE IN ACCORDANCE WITH LAW ...................................................... 14

      A.    WPC Failed To Provide Substantial Record Evidence to Support Its Claim ............. 15

      B.    Habich's Sales to Mexico Are In the Ordinary Course of Trade ............................... 15

CONCLUSION .................................................................................................................. 19

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Hontex Enters v. United States*, 342 F. Supp. 2d 1225 (Ct. Int'l Trade 2004) .............................. 9

*Murata Mfg. Co., Ltd. v. United States*, 820 F. Supp. 603 (Ct. Int'l Trade 1993) ....................... 15

*Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804 (1999) ........................................... 9

*TIJID vs. United States*, 366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) .......................................... 9

**Statutes**

18 U.S.C. § 1001 ................................................................................................................................. 6

19 U.S.C. §1677b ............................................................................................................................. 14

Section 771(15) of the Tariff Act of 1930 ..................................................................................... 15

**Other Authorities**

*Certain Polyethylene Terephthalate Film, Sheet and Strip from India: Final Results of Antidumping Duty Administrative Review*, 70 Fed. Reg. 8,072 (Dep't of Commerce Feb. 17, 2005) ............................................................................................................................................ 9

*Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke in Part*, 73 Fed. Reg. 24,220 (Dep't Commerce May 2, 2008)  19

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 50 (Dep't of Commerce Jan. 3, 2023) ............................................................................................... 2

Statement of Administrative Action Accompanying H.R. Doc. No. 316, 103rd Congress, 2d Session (1994) ................................................................................................................................. 9

*Strontium Chromate from Austria and France: Antidumping Duty Orders*, 84 Fed. Reg. 65,349 (Dep't Commerce Nov. 27, 2019) .................................................................................................. 2

*Strontium Chromate From Austria: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 44,631 (Dep't of Commerce May 21, 2024) ....................... 1, 6, 8, 14

*Strontium Chromate From Austria: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 84,777 (Dep't of Commerce Dec. 6, 2023) ............ 4, 8, 9, 16

**Regulations**

19 C.F.R. § 351.102(b) ........................................................................................ 14, 15

19 C.F.R. § 351.102(b)(3) .................................................................................... 12, 14

19 C.F.R. § 351.102(b)(35) ........................................................................................ 15

NONCONFIDENTIAL VERSION

## INTRODUCTION

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, U.S. Ct. Int'l Trade R. 56.2, Defendant-Intervenor Habich GmbH ("Habich") respectfully submits this response brief in opposition of Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

## I.    ADMINISTRATIVE DETERMINATION UNDER REVIEW

The administrative determination under review is *Strontium Chromate From Austria: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 Fed. Reg. 44,631 (Dep't of Commerce May 21, 2024) ("*Final Results*") (P.R. 95),[1] and the accompanying Issues and Decision Memorandum ("*Final IDM*") (Dep't of Commerce May 14, 2024) (P.R. 94).

## II.    ISSUES PRESENTED FOR REVIEW

1. Parties may be considered affiliated based on either party controlling the other, and the existence of a "close supplier relationship" is one of the factors to be considered whether control exists. But the regulations clearly instruct the U.S. Department of Commerce ("Commerce") not to find control exists unless the relationship can impact decisions concerning the production, pricing, or cost. Was Commerce justified in finding no affiliation between Habich and [      ] when record evidence demonstrates that neither controls the other, and that neither has the potential to impact decisions concerning production, pricing, or the cost of strontium chromate sold by the other?

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the antidumping duty review.

**NONCONFIDENTIAL VERSION**

2. Commerce is directed to use third country sales as the basis for normal value when there is no viable home market, but those sales must be made in the ordinary course of trade. Was Commerce justified in using Habich's sales to Mexico as the basis for normal value when record evidence demonstrates that Mexico represents a competitive market operating under market principles, and Habich's sales to Mexico did not meet any of the criteria that Commerce considers under the regulations when evaluating whether sales are outside of the ordinary course of trade?

## <u>STATEMENT OF FACTS</u>

Commerce issued an antidumping duty order covering strontium chromate from Austria in 2019. *See Strontium Chromate from Austria and France: Antidumping Duty Orders*, 84 Fed. Reg. 65,349 (Dep't Commerce Nov. 27, 2019). Commerce initiated the third administrative review of the order on January 3, 2023, and selected Habich as the sole mandatory respondent. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 50 (Dep't of Commerce Jan. 3, 2023) (P.R. 5).

Habich reported to Commerce that it did not have a viable home market because it did not sell any in-scope products in Austria. *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria*; Habich GmbH's Home Market Viability Notification (Jan. 31, 2023) (P.R. 12). Habich filed its Section A questionnaire response, providing quantity and sales data for its two largest third-country markets: Vietnam and Mexico. *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria*; Habich GmbH's Section A Questionnaire Response (Feb. 8, 2023) ("Habich's Section A Response") (P.R. 13-14) (C.R. 3-4). Petitioner, WPC Technologies ("WPC"), filed deficiency comments on Habich's response, arguing that Habich incorrectly reported non-market economy sales (i.e. sales to Vietnam). *See* Letter from Husch Blackwell LLP to Sec'y of Commerce, Re:

Strontium Chromate from Austria: Petitioner's Initial Deficiency Comments on Habich's Section A Response (Feb. 27, 2023) at 2, 5 (P.R. 18) (C.R. 5). Habich responded by pointing out that it correctly reported its only viable third-country markets, and that it intended to report sales to Mexico for calculation of normal value because it sold both powder and paste to the United States and Mexico was the only market in which Habich sold a sufficient quantity of both powder and paste. *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria*; Habich GmbH's Response to Petitioner's Deficiency Comments on Habich's Section A Response (March 1, 2023) (P.R. 19) (C.R. 6).

In its Section C response, Habich reported that it has a relationship with an unaffiliated party, [                                    ], which acts both as a distributor and commissioned sales agent for Habich in the United States. *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria*; Habich GmbH's Section C Questionnaire Response (March 17, 2023) ("Habich's Section C Response") at C-44 to C-45 (P.R. 24) (C.R. 7). WPC filed deficiency comments alleging—without evidence—that Habich is affiliated with [    ] and requesting Commerce issue specific questions to Habich regarding its relationship with [    ]. *See* Letter from Husch Blackwell LLP to Sec'y of Commerce, Re: Strontium Chromate from Austria: Rebuttal Comments and New Factual Information Response (April 13, 2023) (P.R. 34) (C.R. 78). Habich pointed out that WPC's comments are a collection of unsupported allegations and factual inaccuracies and no longer reliable. *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria*; Habich GmbH's Response to Petitioner's Rebuttal Comments and New Factual Information (April 27, 2023) at 2-3 (P.R. 39) (C.R. 79).

Commerce issued its first supplemental questionnaire, asking twelve detailed questions about Habich's relationship with [        ], to which Habich provided detailed responses. *See* Letter from Rebecca Trainor to Greenberg Traurig, LLP, Re: Antidumping Duty Administrative Review of Strontium Chromate from Austria: Sections A–D Supplemental Questionnaire (Jun. 29, 2023) ("1st Supp. Qnaire") at 4-5 (P.R. 42) (C.R. 81); *see also* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria:* Habich GmbH's Sections A-D 1st Supplemental Questionnaire Response (Aug. 3, 2023) ("SQR1") at 1-8 (P.R. 49) (C.R. 82-147). WPC then filed deficiency comments regarding Habich's supplemental responses, claiming that Commerce had not fully examined the extent of Habich's relationship with [        ], and that Habich's reported sales to Mexico did not occur in the ordinary course of trade. *See* Letter from Husch Blackwell LLP to Sec'y of Commerce, Re: Strontium Chromate from Austria: Deficiency Comments on Habich Supplemental ABCD Questionnaire Response (Sept. 1, 2023) at 2- 4, 10 (P.R. 54) (C.R. 148). Habich submitted rebuttal factual information showing that WPC's allegation that Habich "created a fictitious market in Mexico" is unfounded. *See* Letter from Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium Chromate from Austria*; Habich GmbH's Factual Information to Rebut, Clarify, or Correct Petitioner's Fictitious Market Allegation (Sept. 7, 2023) ("Fictitious Market Allegation Rebuttal") at 2, 4 (P.R. 55) (C.R. 149).

Commerce published its Preliminary Results on December 6, 2023. *See Strontium Chromate From Austria: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 84,777 (Dep't of Commerce Dec. 6, 2023) ("*Preliminary Results*") (P.R. 74), and accompanying Preliminary Decision Memorandum ("*Preliminary Results Memo*") (Dep't of Commerce Nov. 29, 2023) (P.R. 68). Commerce issued a detailed analysis of Habich's relationship with [        ], finding that while Habich maintained a commercial relationship with

[     ], the relationship did not rise to the level of "reliance" for the purposes of finding

affiliation through control under 19 U.S.C. § 1677(33)(G). *See* Memorandum from Jaron Moore

to Irene Darzenta Tzafolias, Re: Antidumping Duty Administrative Review of Strontium

Chromate from Austria, 2021-2022: Close Supplier Relationship and Comparison Market Sales

Analysis (Nov. 30, 2023) ("Close Supplier Relationship Memo") (P.R. 69) (C.R. 166).

Commerce based its decision on record evidence that showed there was no exclusive selling

agreement between the two companies, no evidence that [     ] could not acquire subject

merchandise from other sources, and no evidence that Habich could not use another sales agent

or distributor if it chose to do so. *Id*. at 4-8. Commerce also maintained the use of Mexico as a

valid comparison market, finding that record evidence did not support a finding that sales to

Mexico were outside the ordinary course of trade or "artificial and a sham." *Id*. at 9-10.

Based on WPC's request, Commerce conducted verification of Habich's questionnaire

responses at Habich's plant in Austria. *See* Letter from Husch Blackwell to Hon. Gina M.

Raimondo, Re: *Strontium Chromate from Austria: Request to Verify Habich's Questionnaire*

*Responses* (Apr. 13, 2023) ("Verification Request") (P.R. 32); *see also* Memorandum from Jaron

Moore to The File, Re: Verification of Sales Response of Habich GmbH in the Third

Antidumping Duty Administrative Review of Strontium Chromate from Austria (Feb. 27, 2024)

("Verification Report") (P.R. 84) (C.R. 268). Commerce found no inconsistences from what

Habich reported in its questionnaire responses. *See* Verification Report at 3-7 (P.R. 84). WPC

submitted its case brief, arguing that Commerce "abdicated" its responsibility to discern the

relationship between Habich and [     ] and ignored WPC's comments related to Habich's sales

in Mexico, failing to conduct an ordinary course of trade analysis. *See* Letter from Husch

Blackwell to Hon. Gina M. Raimondo, Re: *Strontium Chromate from Austria: Case Brief*

(March 19, 2024) at 2-13 (P.R. 88) (C.R. 269). In its rebuttal brief, Habich argued that

Commerce correctly determined based on overwhelming record evidence that Habich and

[      ] are not affiliated companies, and that record evidence demonstrates that Habich's sales to

Mexico occurred in the ordinary course of trade. *See* Letter from Greenberg Traurig, LLP to

Sec'y of Commerce, Re: *Strontium Chromate from Austria – Habich GmbH's Rebuttal Brief*

(Mar. 28, 2024) (P.R. 92) (C.R. 270). Commerce published its *Final Results* on May 21, 2024,

continuing to find that Habich and [      ] were not affiliated through a close supplier

relationship, finding no discrepancies in the record as to the relationship between the two, and

that Habich's sales to Mexico were within the ordinary course of trade and appropriate to use as

a basis to calculate normal value. *See Final Results* (P.R. 95); *see also Final IDM* (P.R. 94). This

appeal followed.

## <u>SUMMARY</u>

First, Commerce's determination that Habich and its sales agent and distributor, [      ],

are not affiliated is supported by substantial record evidence and otherwise in accordance with

law. At the core of WPC's argument lies apparent disbelief in why Habich would engage [      ]

as a sales agent, and instead of accepting Habich's explanations (all of which were certified and

submitted subject to penalty under 18 U.S.C. § 1001), WPC argues Commerce should have

asked Habich the same questions over and over again despite already having received answers

supported by substantial record evidence. According to WPC, the arrangement Habich and [

] have is "presumptively commercially unreasonable."[2] Pl.'s Mot. for J. at 19, Dec. 5, 2024, ECF

---

[2] WPC fails to provide statutory authority, prior agency practice, or court precedent that supports
its assertion that there exists "presumpt{ion}" against commercial transactions being treated as at
arms-length in the absence of substantial evidence demonstrating otherwise.

No. 26 ("WPC Brief"). Yet record evidence not only contradicts this presumption, it also explains the basis for Habich and [       ] relationship. Commerce conducted a thorough inquiry into the relationship between Habich and [       ] (which included a week-long verification of Habich's questionnaire responses) and correctly concluded that the two companies were not affiliated through a close supplier relationship.

Second, Commerce's determination to use Habich's sales to Mexico as the basis for normal value was supported by substantial record evidence and otherwise in accordance with law. Despite WPC's argument that Mexico and the United States "are considered a single market," record evidence conclusively demonstrates that Mexico represents a separate competitive market operating under market principles as [                   ] selling to the Mexican market, Habich managed to [                              ] in Mexico, and Habich's sales to Mexico did not meet any of the criteria that Commerce considers under the regulations when evaluating whether sales are outside of the ordinary course of trade. Commerce conducted a thorough inquiry into whether Habich's sales to Mexico were made in the ordinary course of trade (which included a week-long verification of Habich's questionnaire responses), and correctly concluded that Mexico was an appropriate third-country comparison market for the basis of normal value.

## ARGUMENT

### I.    COMMERCE'S DETERMINATION THAT HABICH AND [    ] ARE NOT AFILIATED IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

WPC's allegations that Commerce "failed to inquire into the nature of the overall relationship between Habich and [       ]" is directly contradicted by substantial record evidence. WPC Brief at 18. Not only did Commerce—at WPC's request—issue a detailed supplemental questionnaire to Habich regarding its commercial relationship with [       ], 1st Supp. Qnaire

(P.R. 42) (C.R. 81), but Commerce also—again at WPC's request—conducted onsite verification in Austria to test the veracity of Habich's responses. *See* Verification Request (P.R. 32); *see also* Verification Report (P.R. 84) (C.R. 268). Commerce officials spoke with Habich officials in person who have direct involvement with sales and communication with [     ] and other distributors, examined internal company records and email communications between Habich and [     ], and tested the accuracy of Habich's evidence submitted on the record—it *verified* the relationship between Habich and [     ]. *See* Verification Report at 4-5 (C.R. 268); *see also* *Final IDM* at 4. No reasonable observer would describe the efforts undertaken by Commerce officials in conducting this administrative review as a "failure" or an abdication of their duties as dictated by statute.

WPC claims that Commerce only analyzed the legal relationship and not the *operational* relationship between Habich and [     ]. WPC Brief at 26-27. This is simply false. Commerce dedicated nearly eight pages of its Close Supplier Relationship and Comparison Market Sales Analysis memorandum to a detailed examination of the *operational* relationship between Habich and [     ], analyzing selling and purchasing behavior, lack of exclusivity, and lack of reliance and influence over pricing. *Preliminary Results Memo* at 8 (P.R. 68); *see also* Close Supplier Relationship Memo (P.R. 69). Contrary to WPC's claims, Commerce correctly determined that Habich and [     ] are not affiliated within the context of Section 771(33)(G) of the Act. *Preliminary Results Memo* at 8 (P.R. 68).

Substantial record evidence and a plain reading of the relevant legal standard show that Habich and [     ] do not have a "close supplier relationship." The SAA defines close supplier relationships as those in which the "supplier or buyer becomes reliant upon the other." Close Supplier Relationship Memo at 4 (citing Statement of Administrative Action Accompanying

H.R. Doc. No. 316, 103rd Congress, 2d Session (1994) at 838 ("SAA")) (P.R. 69) (C.R. 166).

WPC claims Habich and [      ] are reliant upon each other through "[      ] co-dependency"

and appears to rest its entire claim on the observation that during the POR, [      ] was either

directly or indirectly involved in ([      ] direct sales to [      ] and [      ] sales where [

                                                    ]). WPC Brief at 27. This observation alone is

not indicative of a "close supplier relationship." The Court of International Trade ("CIT") has

held that even if a supplier sells 100 percent of its exports to a distributor, that fact alone does not

support a finding of a "close supplier relationship", *see TIJID vs. United States*, 366 F. Supp. 2d

1286, 1295-1300 (Ct. Int'l Trade 2005), and that even exclusive sales contracts are insufficient

on their own for finding of affiliation. *See Hontex Enters v. United States*, 342 F. Supp. 2d 1225,

1243 (Ct. Int'l Trade 2004).

     Neither Habich nor [      ] is reliant upon the other. Habich does not sell 100 percent of

its total U.S. exports to [      ]—only [   ]% of transactions ([      ] of a total [      ]) were

direct sales to [      ]. *See* SQR1 at Exhibit SC-01.1 (C.R. 82). In determining whether reliance

exists, Commerce may consider, among other things, whether the subject merchandise being

supplied could be obtained from other parties. *See Certain Polyethylene Terephthalate Film,*

*Sheet and Strip from India: Final Results of Antidumping Duty Administrative Review*, 70 Fed.

Reg. 8,072 (Dep't of Commerce Feb. 17, 2005), and accompanying Issues and Decision

Memorandum at 10 (citing to *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804

(1999)). The record of this proceeding shows that [      ] represents [

                                                    ]. Close

Supplier Relationship Memo at 3 (C.R. 166). In the *Preliminary Results* (unchanged in the *Final*

*Results*) Commerce found that Habich has no knowledge of whether [      ] sells strontium

chromate produced by other companies, and "there is no agreement or prohibition in place that would preclude [      ] from selling strontium chromate produced by {other suppliers}". *Id.* Habich is also not required to sell to any volume to [      ]. Record evidence shows that there is no exclusive sales or distributor agreement between Habich and [      ]. *See id.* at 5 (C.R. 166). There is also no legal agreement that makes the business relationship between Habich and [      ] exclusive. *See id.* If Habich wanted to include another sales agent or distributor, it could. *See id.* (P.R. 69).

WPC also claims "[              ] purchases of strontium chromate come from Habich" yet fails to cite to record evidence to support such a claim. WPC Brief at 27. It would be unable to, because that record evidence does not exist: there is zero evidence to support the claim that [      ] purchases only from Habich. To the contrary: [      ] is not obligated to purchase any volume of strontium chromate from Habich. *See* Close Supplier Relationship Memo at 5 (C.R. 166); *see also* Verification Report at 6 (C.R. 268). There is no agreement or prohibition in place that would preclude [      ] from selling strontium chromate produced by the French producer SNCZ, or the U.S. producer, WPC. *See* Close Supplier Relationship Memo at 5 (C.R. 166); *see also* Verification Report at 6 (C.R. 268).

WPC further asserts that because Commerce did not ask Habich to "explain the role and function performed by Habich in setting prices to [                    ]" as well as "who negotiates the prices and does [      ] provide updates on its [              ] to support its [                    ]," that Commerce failed to fully investigate whether there is in fact a situation where the buyer or seller is reliant on the other. WPC Brief at 20-21. WPC claims that it repeatedly urged Commerce to "investigate Habich's broader role in setting [            ] pricing to the ultimate customer" and Commerce "refused to

gather that requested information." WPC Brief at 21-22. Yet the answer to this allegedly 'critical' question *is already on the record*.

[        ] served a dual role during the POR: it was both a distributor, buying strontium chromate produced by Habich for its own sales to its own respective customers, and it served as a sales agent for Habich for Habich's sales to large, key customers. *See* Close Supplier Relationship Memo at 4 (C.R. 166).

In its capacity as a *distributor*, [        ] sells strontium chromate to smaller and mid-size customers who cannot commit to full container load quantities; these customers order directly from [            ] sells from its own stock in the United States, and Habich is not involved in these sales and has no direct knowledge of the pricing or any other sales terms. *See id*.; *see also* SQR1 at 1-2 (C.R. 82); Verification Report at 4 (C.R. 268) ([


]).

For these sales, Habich sells to [        ] at the prices established in a price list. *See* Close Supplier Relationship Memo at 4 (C.R. 166). Habich is not involved in setting prices to [

] and has no knowledge of how [

] such prices. *See id*.; *see also* Verification Report at 4 (C.R. 268).

Where [        ] acts as *sales agent*, Habich sets the prices and negotiates prices with the customers directly. *See* Close Supplier Relationship Memo at 4 (C.R. 166); *see also* Verification Report at 4 (C.R. 268). The [                    ] were initially set in [            ] for instances where [                ], and Habich [                        ]

with its offerings for instances were [                              ] and buys for its own account.

Verification Report at 4 (C.R. 268).

      The relationship between Habich and [        ] does not have the potential to impact

decisions concerning the production, pricing, or cost of either subject merchandise or foreign like

product, and therefore Commerce could not find affiliation based on control under 19 C.F.R.

351.102(b)(3) even if it determined there was the existence of a "close supplier relationship."[3]

Record evidence shows that [        ] is a [

 

       ]. *See* Close Supplier Relationship Memo at 3 (C.R. 166). [        ] own marketing

materials [                                        ]. *Id.* [        ] is part of a [

 

                ]. *See* Verification Report at 4 (C.R. 268); *see*

*also* Letter from Greenberg Traurig, LLP to Hon. Gina M. Raimondo, Re: *Strontium Chromate*

*from Austria* – Verification Exhibits (Jan. 22, 2024) ("Verification Exhibits") (P.R. 81) (C.R.

179) at VE-III.

      WPC expresses bewilderment at why Habich "needs or wants" a [            ] for is

sales to large U.S. customers and characterizes the relationship as "presumptively commercially

---

[3] While Section 771(33)(G) provides that parties may be considered affiliated based on either
party controlling the other, and per 19 C.F.R. § 351.102(b)(3) a "close supplier relationship" is
one of the factors to be considered whether control over another person exists, the regulation
clearly instructs that "{the Department} will not find that control exists on the basis of these
factors unless the relationship has the potential to impact decisions concerning the production,
pricing, or cost of the subject merchandise or foreign like product" {all emphasis added}.

unreasonable," and claims Commerce failed to follow up and obtain information that would provide an explanation." WPC Brief at 19. Record evidence provides a clear answer to WPC's question: for large, key customers which are serviced directly by Habich, [      ] acts as a sales agent and receives a commission for its role supplementing Habich's direct communication with key customers and helps maintain those customer accounts. *See* Close Supplier Relationship Memo at 3-4 (C.R. 166); *see also* Verification Report at 4 (C.R. 268). As Habich is a small company with an office only in Austria, it is helpful to use a sales agent in the U.S. to supplement Habich's own efforts. Verification Report at 4 (C.R. 268) ("Company officials explained that the company typically [

]. Further, such [

]"). With these key accounts, Habich negotiates directly regarding pricing, quantity, and all other sales terms. The relationship with [      ] has existed for nearly 20 years and originally [                ] customer relationships for Habich in the U.S. market [

]. *Id*. In return, Habich

[                    ] when Habich sells to a customer which was originally introduced by [      ]. *Id*. As the sales relationship between Habich and the customer continues over time,

[                    ] and Habich serves the customer directly; as a result Habich

[                    ]. *Id*. Because the sales relationships which [                ], Habich is in the process of [

] altogether. *Id*. None of these details describe a business relationship

between unaffiliated parties that is "inexplicable", "commercially unreasonable", or indicates control or dependence being forced on one party by the other.

WPC contends Commerce "was confused," "did not grasp that there are two distinct components to the Habich/[      ] relationship," and that Commerce failed to investigate the "commercial unreasonableness" of the commission relationship in is final results. WPC Brief 25-26. The *Final IDM* appears to indicate otherwise as Commerce specifically addresses both in its analysis:

> "[      ] acts as Habich's distributor of subject merchandise and sales agent only for the United States...A written commission agreement from [            ] between Habich and [      ] set forth the commission rates in effect during the POR…Habich's supplemental questionnaire included an explanation of [      ] dual role as a sale agent and distributor." *Final IDM* at 3-4 (P.R. 94).

Contrary to WPC's claims, record evidence clearly shows that there is no affiliation or close supplier relationship between Habich and [      ] as defined under 19 C.F.R. § 351.102(b)(3), *and even if there were*, the relationship between Habich and [      ] does not have the potential to impact decisions concerning the production, pricing, or cost of either subject merchandise or foreign like product, and therefore Commerce would have been precluded from finding affiliation based on control under 19 C.F.R. 351.102(b)(3).

## II.    COMMERCE'S DETERMINATION THAT MEXICO IS THE APPROPRIATE COMPARISON MARKET IS SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

WPC argues that Habich's sales to Mexico are not in the ordinary course of trade and representative and therefore Commerce should not have relied on Mexico as a valid comparison market to calculate normal value in accordance with 19 U.S.C. §1677b." WPC Brief at 31. Commerce was correct when it determined there is "no evidence to support petitioner's claims", Close Supplier Relationship Memo at 10 (P.R. 69), and record evidence proves Habich's sales to Mexico are, in fact, in the ordinary course of trade. *See Final IDM* at 6-8 (P.R. 94).

## A.  WPC Failed To Provide Substantial Record Evidence to Support Its Claim

WPC claims that it "produced evidence" to show that Habich's sales were neither in the ordinary course of trade nor representative, but fails to cite to such evidence. Given the lack of evidence WPC provided to Commerce, Commerce's determination that it found "no evidence to support the petitioner's claims that Habich's sales to Mexico were outside the ordinary course of trade, 'artificial and a sham,' or otherwise unsuitable…" is supported by substantial record evidence and otherwise in accordance with law. *Id*. at 6 (citing to Close Supplier Relationship Memo at 10 (P.R. 69)).

## B.  Habich's Sales to Mexico Are In the Ordinary Course of Trade

The phrase "ordinary course of trade" is defined by Section 771(15) of the Act as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." Section 771(15) of the Tariff Act of 1930 (the "Act"); *see also* 19 C.F.R. § 351.102(b). Determining whether a sale or transaction is outside the ordinary course of trade is a question of fact. *See Murata Mfg. Co., Ltd. v. United States*, 820 F. Supp. 603, 607 (Ct. Int'l Trade 1993). In making such determination, Commerce considers not just "one factor taken in isolation but rather ... all the circumstances particular to the sales in question." *Id*. Commerce's methodology for making this determination is reflected in 19 C.F.R. § 351.102(b), which states, in part, "{t}he Secretary may consider sales or transactions to be outside the ordinary course of trade if the Secretary determines, based on an evaluation of all of the circumstances particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(b)(35). Examples that might be considered outside the ordinary course of trade include: (1) off-quality merchandise; (2) merchandise produced according to unusual product specifications; (3) merchandise sold at aberrational prices or with

15

abnormally high profits; (4) merchandise sold pursuant to unusual terms of sale; or (5)

merchandise sold to an affiliated party at a non-arm's length price. *See* 19 C.F.R. §

351.102(b)(35); *see also Preliminary Results Memo* at 9 (P.R. 68) (citing to Close Supplier

Relationship Memo at 8-10 (P.R. 69)).

Commerce correctly determined that WPC "did not provide sufficient evidence that

Habich's sales to Mexico meet these criteria." Close Supplier Relationship Memo at 9 (P.R. 69).

To the contrary: substantial record evidence demonstrates that none of Habich's sales in Mexico

during the POR meet any of the criteria specified in § 351.102(b)(35):

(1)     Habich did not sell any off-quality merchandise in Mexico. Habich
        sold [      ] products in Mexico: [                    ]. *See*
        Habich's Section C Response at C-13 (C.R. 7). Habich produces
        [                        ] in the same manner, whether the
        product is ultimately sold to the United States, Mexico, or another
        country. *See* Habich's Section A Response at Exhibit A-12
        (C.R. 4) (Habich's product specifications).

(2)     There are also no unusual specifications about the [
              ] that Habich sold to Mexico. *Id*. The product specifications
        for [                    ] are the same whether they are sold to the
        United States, Mexico, or another country. *Id*.

(3)     During the POR, Habich did not sell any strontium chromate at
        "aberrational prices" or with "abnormally high profits." *See* Letter
        from Greenberg Traurig, LLP to Sec'y of Commerce, Re:
        *Strontium Chromate from Austria* – Response to Antidumping
        Questionnaire: Supplemental Sections C and D (Oct. 25, 2023)
        ("SQR2") at Exhibit S2D-01 (P.R. 63) (C.R. 151-164); *see also*
        SQR1 at Exhibits SB-01.1 and SC-01.1 (C.R. 88, 90).

(4)     Habich did not sell strontium chromate to Mexico pursuant to
        "unusual" terms of sale. Terms of payment in Mexico were [
                                    ]. *See* Letter from
        Greenberg Traurig, LLP to Sec'y of Commerce, Re: *Strontium
        Chromate from Austria*: Habich GmbH's Section B Questionnaire
        Response (Mar. 17, 2023) ("Habich's Section B Response") at B-
        25-26 (P.R. 25) (C.R. 26). Terms of payment in the U.S. were [

                            . *See* Habich's Section C Response at C-24
        (C.R. 7). Terms of delivery to Mexico were [      ]. *See* Habich's

        Section B Response at B-25 (C.R. 26) ([    ], the term of delivery in Mexico, is a common Incoterms, *see* Exhibit B-8). Terms of delivery to the U.S. were [             ]. *See* Habich's Section C Response at C-23 (C.R. 7).

(5)     All sales of strontium chromate to Mexico that Habich made during the POR were to unaffiliated customers. Habich's Section B Response at B-3 (C.R. 26). There are [   ] unaffiliated customers in Mexico: [        ]. *Id.* at B-19 and Exhibit B-7. The sales were negotiated in a competitive economy based on market principles, as evidenced by the fact WPC [                   ]. *See* Fictitious Market Allegation Rebuttal at Exhibit 1 (C.R. 149).

Not only do none of Habich's sales fall within the five examples above, but its sales in Mexico also meet any objective standard as being made within "the ordinary course of trade."

      Habich is a small, family-owned business and as such, it does not have the power to create (or destroy) markets for strontium chromate as it chooses in different countries around the world. There are [   ] purchasers of strontium chromate in Mexico: [         ]. *See id.*; *see also* Habich's Section B Response at B-19 and Exhibit B-7 (C.R. 26, 33); Close Supplier Relationship Memo at 9 (C.R. 166). [   ] are large global corporations. *See* Fictitious Market Allegation Rebuttal at Exhibits 2 and 3 (C.R. 149); Close Supplier Relationship Memo at 9 (C.R. 166). Habich, as a small family-owned business, cannot control [   ] company or dictate their purchasing decisions. *Id.* at 2 and Exhibits 1, 2, and 3; Close Supplier Relationship Memo at 9 (C.R. 166).

      Although Habich is small, record evidence does demonstrate it has been able to successfully compete against the handful of other producers of strontium chromate globally— particularly against [   ]. *Id.* at Exhibit 1. Habich is not affiliated with either of the [   ] purchasers of strontium chromate in Mexico, and record evidence indicates that Habich's global

relationships with its customers are determined by market forces. *See* SQR1 at Exhibit SA-03 (C.R. 82); Close Supplier Relationship Memo at 10 (C.R. 166).

Contrary to WPC's claim that Mexico and the United States are considered a "combined market," WPC Brief at 32, Habich does not have the power to erase the national and commercial boundaries between the United States and Mexico.

The market for strontium chromate in Mexico existed prior to antidumping order on *Strontium Chromate from Austria*. The record contains an affidavit from [

] that supports this fact. According to [                ] affidavit, "WPC was a longtime supplier of strontium chromate to [

] for several years." [        ] explains "{d}uring the original investigation POI [

]. Fictitious Market Allegation Rebuttal at Exhibit 1 (C.R. 149). Although [

] affidavit serves as witness to the dynamic nature of the market for strontium chromate in Mexico that existed prior to the issuance of the Order, WPC has placed no evidence on the record that contradicts [              ] affidavit or would indicate that the nature of the market in Mexico has changed in any way.

WPC argues that because Habich's communications with its customers are [

], this means Mexico and the United States constitute a "combined" market and Habich's sales to Mexico are not in the ordinary course of trade or representative. WPC Brief at 32. WPC's argument is directly contradicted by record evidence demonstrating Mexico has a competitive market operating under market principles, as illustrated by the fact that Habich managed to [

]. *See id*.

NONCONFIDENTIAL VERSION

Additionally, the January 2019 sunset date imposed by the EU Commission severely restricted the sale of strontium chromate in Europe to all industries except the aerospace industry so it is no surprise that [

] to purchasing strontium chromate in other countries, including Mexico.[4]

The record shows that the market in Mexico is a competitive market—not a market where global corporations are controlled by a small, family-owned business located in Austria. The burden to prove that Habich's sales are not in the ordinary course of trade—when substantial record evidence demonstrates that they are—rests squarely on the shoulders of WPC, *see Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke in Part*, 73 Fed. Reg. 24,220 (Dep't Commerce May 2, 2008) and accompanying Issues and Decision Memorandum at cmt. 3, and WPC has failed to support its claims. As a result, Commerce's finding that WPC did not provide sufficient evidence that Habich's sales were outside the ordinary course of trade and unsuitable as a third-country comparison market is supported by substantial record evidence.

## **CONCLUSION**

For these reasons, we respectfully request that this Court sustain Commerce's Final Results in their entirety and enter final judgement in favor of the United States.

---

[4] The commercial sales of strontium chromate in the EU were banned effectively January 1, 2019, except for sales to the aerospace industry. Fictitious Market Allegation Rebuttal at 3-4 and Exhibit 4 (C.R. 149). As the [

] and [

]. *Id*.

NONCONFIDENTIAL VERSION

Dated:  March 7, 2025                Respectfully submitted,

/s/ Friederike S. Görgens
Friederike S. Görgens
Matthew L. Kanna
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3100 (Phone)
(202) 331-3101 (Fax)

*Counsel for Habich GmbH*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to the Standard Chambers Procedures of this Court, section 2(B)(1), that this brief contains 6190 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word). Therefore, this brief complies with the Court's word limitation requirement.

/s/ Friederike S. Görgens
Friederike S. Görgens