## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| LUMIMOVE, INC., DBA WPC TECHNOLOGIES, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) ) | Before: The Honorable Joseph A. Laroski, Jr. |
| Defendant, | ) ) | Court No. 24-00105 |
| and | ) ) | **NONCONFIDENTIAL** |
| HABICH GMBH, | ) ) ) | |
| Defendant-Intervenor. | ) ) ) | |

### WPC TECHNOLOGIES' REPLY IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Nithya Nagarajan
Joseph S. Dietrich

HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue NW, Suite 1000
Washington, DC 20006
Tel. (202) 378-2357

*Counsel for Plaintiff*

Dated: April 21, 2025

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ................................................................................... 1

II.    ARGUMENT .......................................................................................... 2

    A.     Commerce's determination that Habich is not "affiliated" with
        [     ] is unsupported by substantial evidence and not in
        accordance with law. ....................................................................... 2

      1.  Commerce failed to adequately investigate and follow up on the
          evidence and arguments presented. ........................................... 2

      2.  As a result of its flawed and insufficient investigation, Commerce's
          determination is arbitrary and capricious and unsupported by
          substantial evidence. ............................................................... 7

    B.     Commerce's determination to use third country sales from
        Mexico is unsupported by substantial evidence and not in
        accordance with law. ...................................................................... 13

III.   CONCLUSION ..................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Allegheny Ludlum Corp. v. United States*,
   215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) ............................................................. 3

*Alloy Piping Prod., Inc. v. United States*,
   201 F. Supp. 2d ...................................................................................................... 14

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
   452 U.S. 490 (1981) ............................................................................................... 16

*Amanda Foods (Vietnam) Ltd. v. United States*,
   714 F. Supp. 2d 1282 (Ct. Int'l Trade 2010) ........................................................... 12

*Bridgestone Americas, Inc. v. United States*,
   636 F. Supp. 2d 1347 (Ct. Int'l Trade 2009) ........................................................... 12

*Coal. of Am. Flange Producers v. United States*,
   448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ............................................................. 3

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ................................................................................................... 16

*Genuine Parts Co. v. Env't Prot. Agency*,
   890 F.3d 304 (D.C. Cir. 2018) ............................................................................... 13

*Home Meridian Int'l, Inc. v. United States*,
   772 F.3d 1289 (Fed. Cir. 2014) .............................................................................. 12

*Invenergy Renewables LLC v. United States*,
   552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021) ............................................................. 3

*Jindal Poly Films Ltd. of India v. United States*,
   365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ..................................................... 12, 14

*Michigan v. EPA*,
   576 U.S. 743 (2015) ................................................................................................. 2

*NMB Singapore Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009) .............................................................................. 14

*SKF USA Inc. v United States,*
   630 F.3d 1373 (Fed. Cir. 2011) ......................................................................... 10, 15

*SKF USA, Inc. v. United States,*
   263 F.3d 1369 (Fed. Cir. 2001) ............................................................................... 7

*Staub Design, LLC v. Carnivale,*
   625 F. App'x 993 (Fed. Cir. 2015) ........................................................................ 12

*Ta Chen Stainless Steel Pipe Co. v. United States,*
   31 C.I.T. 794 (2007) ................................................................................................. 3

*TIJID, Inc. vs. United States,*
   366 F. Supp. 2d (Ct. Int'l Trade 2005) .............................................................. 4, 11

**Statutes**

19 U.S.C. § 1677(33)(G) ...................................................................................... 10, 11

19 U.S.C. § 1677b(a)(1)(B)(ii)(I) ................................................................................ 14

**Regulations**

19 C.F.R. § 351.102(b)(35) .................................................................................... 15, 16

**Other Authorities**

*Certain Oil Country Tubular Goods From Taiwan: Final Determination of Sales at
   Less Than Fair Value,*
   79 FR 41979 (July 18, 2014) ................................................................................ 4, 7

*Notice of Final Determination of Sales at Less Than Fair Value: Large Residential
   Washers from the Republic of Korea,*
   77 Fed. Reg. 75,988 (Dec. 26, 2012) ....................................................................... 4

## I.    INTRODUCTION

Commerce's determination that Habich and its U.S. sales agent, [

], are not "affiliated" is unsupported by substantial evidence and not in accordance with law. The pitfalls start with Commerce's investigative conduct during the administrative review, in which it neglected to inquire about and follow up on record-based evidence of a close supplier relationship between the companies, even after WPC repeatedly brought that evidence to Commerce's attention. Commerce's failure to meet its undisputed duty to investigate led to a "no affiliation" determination pockmarked with factual and analytical holes.

So too is Commerce's decision to use Mexico as a third-country comparison market unsupported by substantial evidence and not in accordance with law. Commerce again bungled the administrative-review investigation, dismissing WPC's comments based on the impermissible ground that WPC had raised similar concerns in past reviews. And Commerce's evidence and explanation for using Mexico comes up woefully short of what the law requires.

WPC explained all this in its opening brief. Neither Commerce nor Habich offers anything convincing in response. Over and over, they fall back on conclusory arguments, just like Commerce did during the administrative review. Oftentimes, Commerce and Habich leave critical parts of WPC's argument undisputed—such as Commerce's broad legal duty to meaningfully investigate the issues, Commerce's reliance on Habich's self-serving responses to questionnaires, and Commerce's improper callback to prior review segments in the third-country analysis. Elsewhere, Habich seeks to supplement Commerce's deficient administrative memoranda; but that will

not work, because the question is review of *Commerce's* explanation at the time, not

Habich's *post hoc* pinch-hit. In the end, the best Commerce and Habich can do is hope

the Court finds that Commerce got it "good enough." But the overwhelming weight of

the argument shows Commerce did not.

The Court should vacate the Final Results and remand for Commerce to fully

and thoroughly investigate the issues and analyze the relationship between Habich

and [      ], and to redo its normal value calculation.

## II.    ARGUMENT

### A.    Commerce's determination that Habich is not "affiliated" with [      ] is unsupported by substantial evidence and not in accordance with law.

#### 1.    Commerce failed to adequately investigate and follow up on the evidence and arguments presented.

In its opening brief, WPC showed that Commerce failed to meet its obligation

to investigate, inquire, and follow up on the evidence and arguments presented to it

in the course of the 2021-2022 administrative review. WPC Br. 15–23. "Not only must

an agency's decreed result be within the scope of its lawful authority," the Supreme

Court has held, "but the process by which it reaches that result must be logical and

rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

In particular, WPC set forth the multiple sources of law from which Com-

merce's significant duty to investigate arises. WPC Br. 15–17. Neither Commerce nor

Habich disagrees. Neither party disputes that Commerce has a duty to investigate.

And neither disputes WPC's characterization of the sources of from which that duty

arises. *First*, Commerce has an obligation to conduct a "diligent inquiry" and "must

investigate allegations presented by interested parties that raise a reasonable doubt

about a material issue." *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1357 (Ct. Int'l Trade 2020) (citing *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1330–33 (Ct. Int'l Trade 2000)); *see also Ta Chen Stainless Steel Pipe Co. v. United States*, 31 C.I.T. 794, 818 (2007) ("{T}he agency has an obligation to make questionnaire questions affected by affiliation issues clear, in light of its own recognition that affiliation is a complex concept." (cleaned up)). *Second*, Commerce has an administrative law duty to respond to WPC's comments that pointed out areas of additional inquiry and investigation. *See, e.g., Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1399 (Ct. Int'l Trade 2021). *Third*, in the context of an antidumping review, Commerce has the sole ability to investigate and inquire; the information needed here is within Habich's control, and WPC has no access without Commerce's intervention.

During the administrative review, based on the limited information available, it became clear that the Habich/[     ] relationship was marked by several irregularities strongly suggesting a close supplier relationship:

- Habich and [     ] maintain a dual-role relationship. First, the two companies have a distributor relationship whereby Habich sells [     ] subject merchandise and then exerts significant control over the price at which [     ] sells to downstream U.S. customers. Second, the two companies also have a commission relationship whereby Habich pays [     ] a commission to sell to its large U.S. customers. **PR24–PR26; CR7–CR75**.

3

- [      ] of Habich's sale of strontium chromate into the U.S. involves [      ]. *And* [                ] purchases of strontium chromate come from Habich.[1]

- Out of a total of [    ] transactions between Habich and [      ], [    ] were direct sales to [      ], and [    ] were sales where [      ] acted as a [

                                                ]. In other words, for [      ] of the entire universe of Habich's U.S. sales, [      ] acted as Habich's selling agent. **PR34**; **CR78** at 6.

- Despite this significant relationship, Habich and [      ] claimed to have "only" a "verbal agreement{ }." **PR34** and **CR78** at 6.

This information and these irregularities prompted the following questions, which should have been investigated:

- Why Habich needs [    ] (or any company) to be a commissioned sales agent, given that the customers [    ] serves in this capacity are large multi-national customers with whom Habich already has a direct relationship. **PR34** and **CR78** at 5; **PR32**; **PR54**; **CR148**.

---

[1] *See Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers from the Republic of Korea*, 77 Fed. Reg. 75,988 (Dec. 26, 2012), and accompanying Issues and Decision Memorandum at Comment 8 (explaining that factors supporting a close supplier relationship include the percentage of the buyer's total purchases that are sourced from the supplier, the existence of alternative suppliers of the input, and whether there is an exclusive supply agreement); *see also TIJID*, 366 F. Supp. 2d at 1295–1300 (explaining that a close supplier relationship exists when the relationship is significant and could not be easily replaced); *Certain Oil Country Tubular Goods From Taiwan: Final Determination of Sales at Less Than Fair Value*, 79 FR 41979 (July 18, 2014) and accompanying Issues and Decision Memorandum at 5–6 (similar).

- Whether the [                              ] effectively offered [      ] a post-sale price adjustment.

- How [      ] sales agent transactions compared to its distributor transactions. Pursuing this line of inquiry would also reveal if there were pricing differences which would reveal or unmask any dumping. **PR34** and **CR78** at 6.

- Whether Habich has any direct *or indirect* role in negotiating [      ] downstream sales. **PR32**; **PR54**; **CR148**.

- What Habich's role is in setting [      ] prices for the ultimate customer. **PR32**; **PR54**; **CR148**. Specifically, WPC asked Commerce to investigate Habich's role in setting prices for [      ] downstream customers, and to request documentation reconciling the price charged by Habich to [


                                        ]. **PR34** and **CR78** at 4–5; **PR54**; **CR148**.

- WPC even supplied a specific question for Commerce to ask Habich: "Explain the role and function performed by Habich in setting prices to [


                                        ]. Who negotiates the prices and does [      ] provide updates on its [                    ] to support its [                        ]." **PR32** and **PR54** at 4; **CR148** at 6.

- Review of [        ] resale transactions, because if [      ] is selling [


                                        ], then

5

that would be strong evidence that [                    ] are not at arm's length, and strong evidence of reliance and affiliation between [    ] and Habich. Yet Commerce—the only person or entity with any power to do so—refused to gather that requested information.

Despite all these issues being apparent from the record, Commerce did not meaningfully investigate them. On June 29, 2023, Commerce issued its first supplemental questionnaire. **PR42**; **CR81**. While Commerce inquired about some of WPC's concerns, it neither requested information about the ultimate U.S. customers of products sold to [    ] nor documentation showing that sales to these downstream customers resulted in a commercially viable profit for [    ]. And Commerce asked only a watered-down version of WPC's requested question on negotiation and pricing. **PR42** and **CR81** at 4.

Habich's meager and conclusory responses apparently satisfied Commerce—but they should not have. On August 4, 2023, Habich responded to the supplemental questionnaire, in which it simply denied any close supplier relationship with [    ]. **PR49**; **CR82**–**CR147**. In response to the watered-down version of WPC's question on negotiation and pricing, Habich merely stated that it is "helpful to use a sales agent in the U.S. [      ] to supplement Habich's direct communication with key customers and to help maintain those customer accounts." **PR49** at 2. But at the same time, Habich also provided information that directly undercut its own answers. The customers serviced by [    ], Habich admitted, "are serviced directly by Habich" and that "Habich negotiates directly regarding pricing, quantity, and all other sales terms."

*Id.* (Habich parrots this explanation in its brief. Br. 13.) This admission directly supports WPC's point that the Habich/[     ] relationship appears redundant, lacks commercial sense, and likely exists to mask dumping. At the very minimum, Commerce should have investigated further. But it did not.

Rather than defend its investigative conduct in detail, Commerce claims that WPC's "discussion misses the point" and that "Commerce *did* thoroughly examine" Habich and [     ] relationship. Commerce Br. 11. But aside from recounting a basic chronology of what it did, Commerce does not dispute WPC's argument that Commerce failed to inquire into the *specific* comments and issues WPC highlighted. Indeed, Commerce appears to assume that it can satisfactorily discharge its obligation to investigate simply asking a high volume of questions. *E.g.*, Commerce Br. 11 ("Through initial questionnaires and two rounds of supplemental questionnaires, Commerce posed more than 70 questions to Habich . . . ."). Quantity is no substitute for quality. What matters—and what Commerce failed to do—is ask questions about specific issues, and then follow up on Habich's conclusory and facially unreasonable responses.

> ## 2. As a result of its flawed and insufficient investigation, Commerce's determination is arbitrary and capricious and unsupported by substantial evidence.

Commerce's inadequate investigation into the relationship between Habich and [     ] led to an arbitrary-and-capricious determination that is unsupported by substantial evidence.

*First*, Commerce "entirely failed to consider an important aspect of the problem": the nature of the commission relationship between Habich and [     ]. *SKF*

*USA, Inc. v. United States*, 263 F.3d 1369, 1373 n.3 (Fed. Cir. 2001). *See* WPC Br. 24–26 (setting forth argument).

It is undisputed that Habich and [      ] overall relationship includes two distinct components. *See* Commerce Br. 14–15; Habich Br. 11. One is the commission or "sales agent" component in which Habich depends on [      ] to get its product to large U.S. end users. Two is the distributor component in which Habich sells [      ] the product, and [      ] distributes the product to small and medium U.S. end users. **PR24–PR26; CR7–CR75**.

In its comments to Commerce, WPC argued that the Habich/[      ] commission relationship made no commercial sense—both on its face, and in light of evidence on the record that Habich already has direct relationships with the large U.S. end users. **PR32; PR54; CR148** (WPC's deficiency comments of April 17, 2023, and September 1, 2023).

In its response brief, Habich attempts to explain its relationship with [      ]. *See* Habich Br. 13–14. But that is beside the point. What matters is whether *Commerce* sufficiently explained its reasoning, supported by evidence, on the *administrative record*. Neither Commerce nor Habich come to grips with Commerce's failure to do so.

At any rate, none of what Habich says now offers any meaningful insight into its relationship with [      ], much less supports Commerce's finding that the two companies are not "affiliated." Habich simply says that "it is helpful to use a sales agent" and that it has had a "relationship with [      ]" for "nearly 20 years." Habich Br. 13.

If anything, these statements support a close supplier relationship. And they certainly do nothing to address WPC's primary argument. To the contrary, the record still shows that Habich has existing and long-term global relationships with its large end users, including multi-national companies like [                    ]. Outside the U.S., Habich makes *direct* sales to these large end users. Yet for sales to these *same* large end users in the U.S., Habich relies on [     ] as a "sales agent" middleman. *See also* Habich Br. 13 ("With these key accounts, Habich negotiates directly . . . ."). Given its preexisting global direct relationship with the product's large U.S. end users, Habich would have no rational reason to need—or want—an intermediary "sales agent" to facilitate sales to its large U.S. end users. Such an arrangement is presumptively commercially unreasonable—and Habich never provided evidence or explanation to show otherwise.

Also in its opening, WPC explained that Commerce was confused: in its Close Supplier Memorandum, Commerce conflated the two distinct components to the Habich/[     ] relationship. WPC Br. 25–26. For example, Commerce remarked about "price lists" in the context of the commission component—but price lists relate only to the distributor component. **PR68**; **CR166** at 3–6. Indeed, Commerce never explained how price lists do or even could have anything to do with the commission relationship. Commerce doubles down on that confusion in its brief, writing that "Habich and [     ] maintained a written commission agreement and Habich also provided written price lists to [     ] during the POR." Commerce Br. 12; *see also* Habich Br. 14.

*Second*, Commerce "failed to consider" another "important aspect of the problem": the "operational" relationship between Habich and [      ]. *SKF USA*, 630 F.3d at 1373 n.3.[2] WPC set forth this argument at length in its opening brief. WPC Br. 26–27. In response, Habich contends that WPC's argument "is simply false," due to Commerce's Close Supplier Memorandum. Habich Br. 8. And Commerce, for its part, maintains that it did "discuss{ } key aspects of the operational relationship," "including the lack of any legal *or functional exclusivity arrangements*." Commerce Br. 16 (emphasis added).

But contrary to what Habich and Commerce claim, the Close Supplier Memorandum does nothing of the sort. Commerce obviously did not consider functional exclusivity. In particular, Commerce's Memorandum never considered the *dual* [      ] co-dependency of Habich and [      ]. The record shows that [      ] of Habich's sale of strontium chromate into the U.S. involves [      ]—*and* that [              ] purchases of strontium chromate come from Habich. Indeed, the record shows that there are a total of [   ] transactions, out of which [   ] transactions are direct sales to [      ] and the remaining [      ] are sales where [      ] acted as a [

      ]. This is powerful evidence of operational reliance, in which the

---

[2] The statute defining "affiliated" is disjunctive, requiring an analysis of both legal *and* operational relationships: "{A} person shall be considered to control another person if the person is legally *or operationally* in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33)(G) (emphasis added). "Operational" relationship details are necessary to examining whether the buyer or seller is reliant on the other. Thus, contrary to Commerce's suggestion, this argument is *not* about Commerce "further analyz{ing} whether parties can exercise restraint or direction." Commerce Br. 16.

relationship is significant and could not be easily replaced. *See TIJID*, 366 F. Supp. 2d at 1295–1300.

On this point, both Commerce and Habich both cite *TIJID* in support. Commerce Br. 17; Habich Br. 9 (citing *TIJID vs. United States*, 366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005)). But *TIJID* actually highlights the stark difference between the parties' relationship there and the close supplier relationship here. In *TIJID*, the mere fact that "Fay Candle sells 100 percent of its candles to TIJID" did not support a close supplier relationship. 366 F. Supp. 2d at 1299. That makes sense, because that fact said nothing about TIJID's overall supply; even though Fay Candle supplied only TIJID, TIJID may have also counted several other candle manufacturers among *its* suppliers. Here, there is evidence of *dual* co-dependency. Not only do [    ] of Habich's sales of strontium chromate into the U.S. involve [    ]—[         ] purchases of strontium chromate come from Habich. That relationship, unlike the relationship in *TIJID*, is that of a close supplier. (Habich downplays this, noting that [    ] is not the *end user* of "100 percent" of Habich's sales—but Habich never disputes that [    ] is critically involved in [                    ]. Habich Br. 9.)

*Third*, Commerce's determination lacks the support of substantial evidence. *See* WPC Br. 28–29 (setting forth argument). After WPC repeatedly raised concerns about the commercial illegitimacy of the Habich/[    ] relationship, Commerce cited only one piece of evidence in response: "In [    ] capacity as a domestic [        ], it supplements Habich's direct communication with [

                    ]." **PR68** and **CR166** at 4. This single statement is conclusory and

parrots Habich's self-serving questionnaire response. Such conclusory, self-serving statements do not constitute substantial evidence. *Staub Design, LLC v. Carnivale*, 625 F. App'x 993, 996 (Fed. Cir. 2015) (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1295 (Fed. Cir. 2014)) ("{S}elf-serving statements do not constitute substantial evidence.")); *see Bridgestone Americas, Inc. v. United States*, 636 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2009) (finding lack of substantial evidence where "the only evidence on the record that could support Commerce's determination" was a "conclusory" statement).

Commerce does not dispute that conclusory, self-serving statements fail the substantial-evidence test. Instead, Commerce asserts that its determination is supported by substantial evidence because it "relied upon Habich's responses to initial and supplemental questionnaires." Commerce Br. 18. But *which* responses? And how do those responses support Commerce's determination? Commerce does not say—either in the administrative determination, or in its brief here. Commerce's substantial-evidence argument, in other words, mimics the administrative record: devoid of explanation, unsupported by evidence. *See Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l Trade 2019) ("Commerce must explain {its} determination and the determination must be supported by substantial evidence on the record."); *Amanda Foods (Vietnam) Ltd. v. United States*, 714 F. Supp. 2d 1282, 1286 n.4 (Ct. Int'l Trade 2010) ("To be supported by substantial evidence, Commerce's determinations must be supported by a rational link to information.").

12

Moreover, Commerce does not meaningfully dispute WPC's argument that Commerce minimized significant evidence that ran counter to its conclusion. *See* WPC Br. 28–29; Commerce Br. 18. Specifically, significant record evidence shows an operational relationship between Habich and [      ] marked by [      ]: [      ] of Habich's sale of strontium chromate into the U.S. involves [      ]—*and* [            ] purchases of strontium chromate come from Habich. **PR54** and **CR148** at 7. Indeed, the record shows that there are a total of [     ] transactions, out of which [   ] transactions are direct sales to [      ] and the remaining [     ] are sales where [      ] acted as a [                            ]. *Id.* Evidence further shows that Habich and [      ] have an entrenched relationship that has gone on for 20 years, and by Habich's own admission the relationship was not based on normal written agreement but instead was based upon "mutual trust." **PR49** at 4. Commerce's findings run contrary to this significant evidence, which Commerce downplayed to reach its predetermined conclusion. *See Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018) (explaining that an agency "cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation").

**B.   Commerce's determination to use third country sales from Mexico is unsupported by substantial evidence and not in accordance with law.**

Commerce's determination to use Mexico as a third country comparison market to calculate normal value is arbitrary and capricious and contrary to evidence.

In the administrative review, WPC produced evidence to show that Habich has no viable sales *to Mexico* as such. Instead, its sales to Mexico are all part of sales to

a [                                                                    ] and thus cannot

serve as a comparison market for purposes of calculating normal value. *Cf.* 19 U.S.C.

§ 1677b(a)(1)(B)(ii)(I); *Alloy Piping Prod., Inc. v. United States*, 201 F. Supp. 2d at

1276. This argument appeared in WPC's opening brief. *See* WPC Br. 30–34; *see also*

**PR49**; **PR54** and **CR148** at 10–11.

    Commerce ignored WPC's evidence and failed to respond to WPC's comments

in its administrative memoranda. WPC Br. 32. Now, Commerce insists that it "re-

peatedly addressed WPC's arguments, along with providing examples as to why the

record evidence supported Commerce's determination." Commerce Br. 20. But the

memoranda pages Commerce cites do not actually *analyze* anything. They merely

state both sides' arguments (often verbatim) and announce Commerce's outcome.

That is not reasoned decisionmaking. *NMB Singapore Ltd. v. United States*, 557 F.3d

1316, 1319 (Fed. Cir. 2009) ("{W}hile its explanations do not have to be perfect, the

path of Commerce's decision must be reasonably discernable to a reviewing court.");

*Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l

Trade 2019) ("Commerce must explain that determination and the determination

must be supported by substantial evidence on the record. Based on Commerce's con-

clusory statements, the court cannot discern the path of Commerce's decision-making

nor determine that it is supported by substantial evidence.").

    In its brief, Commerce contends that "Habich's sales to Mexico are distinct from

its sales to the United States" because "[     ] acts as Habich's distributor and sales

agent for sales to the United States and does not provide sales agent services for

14

Habich in Mexico" and because "Habich is not affiliated with its customers." Commerce Br. 19. But neither of those points relates to third-country sales; they both instead relate to the separate "affiliation" question, addressed above.

As WPC explained, Commerce also "relied on factors" it was "not intended it to consider": comments and facts from prior administrative-review segments. *SKF USA*, 630 F.3d at 1373 n.3; *see* WPC Br. 33. Commerce does not deny that it considered material from past administrative reviews. It could not: in the final IDM, Commerce expressed significant frustration that WPC "repeats its previous allegations and arguments" and "has made a variety of allegations against Habich's sales to Mexico in every administrative review segment of this proceeding." **PR94** at 7–8. Commerce in its brief offers no explanation whatsoever for why it considered these out-of-bounds factors. It does not matter that Commerce *also* considered facts from this administrative review; what matters is that Commerce impermissibly considered materials from prior reviews. That alone renders Commerce's determination arbitrary.

Finally, in its administrative memoranda, Commerce faulted WPC for not showing that Habich's sales to Mexico met any of the "example{}" "criteria" in the relevant regulation, 19 C.F.R. § 351.102(b)(35); *see* **PR68** and **CR166** at 9; **PR94** at 4. Commerce in its brief claims that was just fine, because "the regulation *also* requires sales or transactions to have characteristics that are 'extraordinary for the market in question' to deem sales outside the ordinary course of trade." Commerce Br. 21 (quoting § 351.102(b)(35)). But Commerce did not rely on *that* reasoning in its administrative memoranda. Instead, this is a *post hoc* attempt in Court to paper over an

15

NONCONFIDENTIAL VERSION

administrative error of law. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020) (explaining that courts can "{c}onsider{} only contemporaneous explanations for agency action"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("{T}he post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action.").

Habich, too, hews to the "examples" in § 351.102(b)(35). Habich Br. 17. But that responds to neither WPC's argument that those *examples* are merely illustrative nor its argument that there *is no Mexico market* to begin with. Indeed, the remainder of Habich's brief misses the point—WPC does not argue that Habich *controls* "global corporations," Habich Br. 19, but rather that Mexico does not exist as a distinct and independent market from which to calculate value.

## III. CONCLUSION

The Court should vacate and remand the determination on review.

Respectfully submitted,

/s/ Nithya Nagarajan
Nithya Nagarajan
Joseph S. Diedrich
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue NW, Suite 1000
Washington, DC 20006
(202) 378-2334
nithya.nagarajan@huschblackwell.com

*Counsel for Plaintiff*

Dated: April 21, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the Court's word limitation requirement. The word count for the foregoing brief, as computed by Husch Blackwell's word processing system (Microsoft Word), is 4,309 words.

Dated:        April 21, 2025                          /s/ Nithya Nagarajan
                                                                Nithya Nagarajan

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LUMIMOVE, INC., DBA WPC TECHNOLOGIES, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) Before: The Honorable Joseph A. ) Laroski, Jr. ) |
| Defendant, | ) Court No. 24-00105 ) |
| and | ) ) |
| HABICH GMBH, | ) ) |
| Defendant-Intervenor. | ) |

## **<u>PROPOSED ORDER</u>**

On consideration of the motions for judgment on the agency record filed by Lumimove, Inc. d/b/a WPC Technologies ("WPC"), Defendant and Defendant-Intervenor's response, and all other pertinent papers, it is hereby:

ORDERED that the motions filed by WPC is granted, and it is further

ORDERED that the final determination of the U.S. Department of Commerce ("Commerce") is set aside as unlawful, and it is further

ORDERED that Commerce's final determination is remanded for reconsideration in accordance with the Court's decision.

Dated: _____
New York, New York                          _____
                                            The Honorable Joseph A. Laroski, Jr., Judge