Slip Op. 25-142

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| LUMIMOVE, INC., D/B/A WPC TECHNOLOGIES, | |
| Plaintiff, | |
| v. | Before: Joseph A. Laroski, Jr., Judge |
| UNITED STATES, | Court No. 24-00105 |
| Defendant, | |
| HABICH GMBH, | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Sustaining in full the final results of the U.S. Department of Commerce concerning its administrative review of the antidumping duty order on strontium chromate from Austria and denying plaintiff's motion for judgment on the agency record.]

Dated: October 29, 2025

<u>Joseph S. Diedrich</u>, Husch Blackwell LLP, of Washington, D.C., argued for plaintiff Lumimove, Inc., d/b/a WPC Technologies. With him on the briefs was <u>Nithya Nagarajan</u>.

<u>Collin T. Mathias</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. On the brief were <u>Brittney M. Welch</u>, Trial Attorney, <u>Brett A. Shumate</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director. Of counsel, arguing for defendant, was <u>Jack Dunkelman</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Frederike S. Görgens</u>, Greenberg Traurig, LLP, of Washington, D.C., argued for defendant-intervenor Habich GmbH. With her on the brief was <u>Matthew L. Kanna</u>.

Laroski, Judge: This action is a challenge to the final results issued by the U.S.

Department of Commerce ("Commerce") in its administrative review of the

antidumping duty ("AD") order on strontium chromate imported from Austria

("Austrian SC") for the period of review spanning 2021 to 2022.  Strontium

Chromate from Austria: Final Results of Antidumping Duty Administrative Review;

2021–2022, 89 Fed. Reg. 44,631 (Commerce May 21, 2024), P.R. 95; accompanying

Issues and Decision Memorandum (Commerce May 14, 2024), P.R. 94 (collectively,

"Final Results" or "IDM").  The Final Results addressed, inter alia, whether Habich

GmbH ("Habich"), a manufacturer of Austrian SC, is affiliated with its North

American sales agent ("Company X"), and whether Habich's normal value may be

calculated based on its sales to Mexico.  As to affiliation, Commerce concluded that

Habich is not affiliated with Company X.  As to normal value, Commerce concluded

that Habich's sales to Mexico provided an appropriate basis for calculating normal

value due to the lack of a viable home market or permissible alternative third-

country markets.  Plaintiff Lumimove, Inc., d/b/a WPC Technologies ("WPC")

challenges both conclusions, arguing that during the administrative review process

Commerce overlooked and failed to further investigate allegations and information

that supported a finding of affiliation and undermined the suitability of Mexico as

an appropriate basis for normal value.  These investigative failures, according to

WPC, resulted in an analysis by Commerce that is arbitrary and capricious and

unsupported by the record.  Defendant United States (the "Government") and

Defendant-Intervenor Habich respond by arguing that both conclusions find ample factual and legal support while underscoring Commerce's extensive investigation into Habich's business and WPC's concerns.  As detailed below, the court agrees with the Government and therefore denies WPC's motion for judgment on the agency record in full and enters judgment sustaining Commerce's findings.

## BACKGROUND

### I.    Commerce Investigation, Habich Questionnaires, and WPC Comments

In November 2019, Commerce published the relevant antidumping duty order, which concerns Austrian SC (the "Order").  Austrian SC from Austria and France: Antidumping Duty Orders, 84 Fed. Reg. 65,349 (Dep't of Commerce Nov. 27, 2019).  In January 2023, Commerce initiated its third administrative review of the Order, which covered the period of November 1, 2021, to October 31, 2022.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 88 Fed. Reg. 50 (Dep't of Commerce Jan. 3, 2023).

In the months that followed, Commerce issued an initial questionnaire to Habich, Habich responded, and WPC commented on deficiencies in Habich's responses.  Notably, among its initial responses, Habich indicated that it did not sell any in-scope products within its home market, Austria, and proposed Vietnam and Mexico as relevant third-country sales.  Habich Initial Questionnaire Response, P.R. 13–14 (Feb. 8, 2023).  In subsequent questionnaire responses, Habich also documented its dealings with Company X, a distributor of Habich's in-scope

products to customers in the United States that also receives commissions for facilitating Habich's direct sales to certain U.S. customers.  <u>Habich Section C Questionnaire Response</u>, P.R. 24−26 (Mar. 17, 2023).

Notably, Habich also characterized its relationship with Company X as unaffiliated under section 771(33)(G) of the Tariff Act of 1930 and related regulatory provisions.  <u>Id.</u>; <u>see</u> 19 U.S.C. § 1677(33)(G); 19 C.F.R. § 351.102(b)(3).  In further comments, WPC alleged that Habich and Company X were in fact affiliated under applicable law due to a close supplier relationship and requested additional investigation on this point.  <u>WPC Rebuttal Comments</u>, P.R. 34 (Apr. 13, 2023).  In contending that "there is clearly a close supplier relationship . . . such that Habich has the ability to exercise significant control over the pattern and pricing of sales by and through [Company X]," and further stating that the relationship "does not make sense on its face," WPC did not proffer or otherwise identify evidence supporting its claims.  <u>Id.</u> at 7−10.  Rather, WPC focused its discussion of the record evidence on the share of U.S. sales Company X handled for Habich, the proportion of sales transactions for which Habich paid Company X a commission, and the nature of the two companies' commission relationship.  <u>Id.</u> at 2−4.  Although convinced of the affiliation between Habich and Company X, WPC asked Commerce to investigate further.  In response, Habich called WPC's comments a "collection of unsupported allegations and factual inaccuracies," but did not address affiliation.  <u>Habich Response to WPC Rebuttal Comments</u>, P.R. 39, at 2−3 (Apr. 27, 2023).

In June 2023, Commerce issued its first supplemental questionnaire, posing additional questions about Habich's relationship with Company X and its Mexico sales, to which Habich responded.  See First Supplemental Questionnaire to Habich, P.R. 42, at 4–5 (June 29, 2023); Habich First Supplemental Questionnaire Response, P.R. 49, at 1–8 (Aug. 4, 2023) ("Habich SQR1").  In additional comments, WPC contended that Commerce's supplemental questions and Habich's supplemental answers were inadequate, alleged that Habich's reported sales to Mexico had not occurred in the ordinary course of trade, and asked Commerce to seek additional information.  WPC Second Deficiency Comments, P.R. 54, at 2, 4, 10 (Sept. 1, 2023) (WPC DC2).  WPC highlighted Habich's price negotiations with downstream customers as relevant to its affiliation claims.  Id. at 5–6.  Finally, unsatisfied by Habich's statement that it did not have an exclusive legal arrangement with Company X, WPC asserted that Commerce should investigate the "business and economic reality" of the relationship, rather than just legal formalities.  Id. at 4.  In response, Habich maintained that WPC's allegations were unfounded.  Habich Second Rebuttal Comments, P.R. 55, at 2, 4 (Sept. 7, 2023).

II.    **Commerce's Preliminary Results and Close Supplier Memorandum**

In December 2023, Commerce published the preliminary results of the administrative review.  See Austrian SC from Austria: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022, 88 Fed. Reg. 84,777 (Dep't of Commerce Dec. 6, 2023), accompanying Preliminary Decision Memorandum (Nov.

29, 2023) ("Preliminary Results" or "PDM").  Commerce also issued a memorandum

dedicated to WPC's allegations that Habich and Company X were affiliated by

virtue of a close supplier relationship and that using Mexico as a comparison

market was improper.  See Close Supplier Relationship and Comparison Market

Sales Analysis, P.R. 69 (Nov. 30, 2023) ("CSM").  Commerce agreed with WPC that

Austria did not represent a viable comparison market and, despite WPC's concerns,

instead selected Habich's sales to Mexico as the basis for its normal value

calculations.  PDM at 8−9.  Commerce also concluded that Habich's relationship

with Company X did not satisfy the control or reliance threshold required for a

finding of affiliation.  CSM at 8.  In so concluding, Commerce emphasized the lack of

an exclusive relationship and discussed the applicable statutory and regulatory law.

Id. at 5 (citing TIJID v. United States, 366 F. Supp. 2d 1286, 1295−1300 (CIT 2005)

and Hontex Enters. v. United States, 342 F. Supp. 2d 1225, 1243 (CIT 2004)).

## III.    Commerce's Verification and Final Results

In January 2024, Commerce conducted verification of Habich's questionnaire

responses in Austria.  Verification of Habich Responses, P.R. 84 (Dep't of Commerce

Feb. 27, 2024) ("Verification").  Summarizing this process, Commerce stated:

> The verifiers directly asked company officials the specific questions
> raised by the petitioner with respect to why Habich uses a sales agent
> in the United States, the role it plays in Habich's sales of [Austrian SC]
> in the United States, as well as the past history and future plans of the
> relationship.

IDM at 4.  Commerce concluded: "We found no evidence at verification that contradicted the information on which we made our preliminary finding that no close supplier relationship exists between Habich and its customer."  Id.

Commerce grounded its analysis in the context of WPC's core assertion that for Commerce to properly address the affiliation issue, it needed to obtain "accurate and complete information from Habich on the full extent of its relationship" with Company X and "revise and redo its close supplier analysis accordingly."  Id. at 3. In addition to highlighting the verification process, Commerce began its response to this call to action by noting how, in the PDM and CSM, it had "explained in detail the robust record evidence on which [it] based our determination that no affiliation exists" between Habich and Company X.  Id.  It also observed that through the supplemental questionnaires directed to Habich, Commerce had posed numerous questions based on those suggested by WPC.  Id. at 4–5 (discussing WPC DC2).

In short, in the Final Results, Commerce stood by its Preliminary Results. Commerce again explained that this court has "held that even if a supplier sells 100 percent of its exports to a single distributor, that fact alone does not support a finding of a close supplier relationship," id. at 5 (citing TIJID, 366 F. Supp. at 1295–1300), and noted that this court has "ruled that even *exclusive* sales contracts . . . are insufficient on their own for a finding of affiliation."  Id. (citing Hontex, 342 F. Supp. 2d at 1243).  Responding to WPC's insistence on continued investigation into Company X, Commerce described its efforts to that point:

> Informed by [WPC's] express concerns throughout this proceeding, we developed a record that contains more than sufficient information to analyze the relationship between Habich and [Company X]. We then performed an analysis of the facts of record at the Preliminary Results and subsequently verified those facts, finding no discrepancies.

Id. at 6 (cleaned up). Thus, believing it gathered and reviewed the necessary information on affiliation and rooted its analysis in both fact and law, Commerce left undisturbed its initial finding that Habich was not affiliated with Company X.

Concerning the appropriate basis for calculating normal value, Commerce maintained a consistent position from the Preliminary Results to the Final Results, agreeing with WPC that Austria was not a viable comparison market because Habich had no home-country sales during the period of review. Compare PDM at 8−9, with IDM at 6−8. Commerce disagreed with WPC on Mexico's viability as a comparison market and rejected WPC's arguments that record evidence undermined the premise that Habich's sales to Mexico were fairly understood as a standalone market. IDM at 7−8. Thus, Commerce viewed Mexico as an appropriate comparison market and rejected WPC's constructed value request. Id. at 8.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2020) and 19 U.S.C. § 1516a(a)(2) (2020). Section 1581(c) provides for exclusive jurisdiction over any civil action commenced under section 1516a. 28 U.S.C. § 1581(c). A challenge to the final results of an administrative review conducted by Commerce is a reviewable determination under section 1516a(a)(2). 19 U.S.C. § 1516a(a)(2); see,

e.g., Changzhou Trina Solar Energy Co. Ltd. v. United States, 352 F. Supp. 3d 1316,
1323 (CIT 2018).  In reviewing such a challenge, the court sustains Commerce's
analysis and findings unless they are "unsupported by substantial evidence on the
record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).
Whether a determination by Commerce is supported by substantial evidence and
otherwise in accordance with law typically turns on whether its analysis and
findings are reasonable based on its consideration of the administrative record.
See, e.g., Worldwide Door Components, Inc. v. United States, 119 F.4th 959, 968
(Fed. Cir. 2024) ("Substantial evidence is such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion.") (quotation omitted).

        The phrase "otherwise in accordance with law" also calls for evaluation of
whether Commerce acted consistent with applicable statutory and regulatory law,
as well as with the principles of arbitrary-and-capricious review under section
706(2)(A) of the Administrative Procedure Act ("APA Section 706").  5 U.S.C.
§ 706(2)(A).  Because the Final Results qualify as agency action under APA section
706, this court necessarily considers, alongside its substantial evidence analysis,
whether Commerce reasonably considered the "relevant data" and provided a
"satisfactory explanation for its action including a rational connection between the
facts found and the choice made."  Motor Vehicle Manuf. Ass'n of U.S., Inc. v. State
Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Arbitrary-and-capricious
review therefore requires this court to consider whether Commerce provided an

unlawful or unreasonable basis for its action or otherwise ignored an "important

aspect of the problem."  E.g., SFK USA Inc. v. United States, 630 F.3d 1365, 1374

(Fed. Cir. 2011) (quoting State Farm, 463 U.S. at 43).  Like this court's substantial

evidence analysis, arbitrary-and-capricious review demands scrutiny of whether

Commerce's approach to a given issue was reasonable.

## DISCUSSION

In challenging the Final Results, WPC contends Commerce made two

unreasonable determinations that require remand.  According to WPC, Commerce

erred, first, in finding that Habich and Company X are not affiliated, and second, in

finding that normal value should be calculated based on Habich's third-country

sales to Mexico.  WPC challenges not only the substantive reasonableness of these

conclusions based on the record before Commerce, but also the procedural

lawfulness of Commerce's investigation into affiliation and normal value.

## I.    Affiliation

### A.    Party Arguments

Regarding affiliation, WPC highlights "three independent and clear sources

of law" that it posits require Commerce to improve upon the investigation and

analysis memorialized by the Final Results.  First, WPC notes what it describes as

Commerce's duty of "diligent inquiry," or cases in which this court has stated that

Commerce must "investigate allegations presented by interested parties that raise a

doubt about a material issue," Coal. Am. Flange Producers v. United States, 448 F.

Supp. 3d 1340, 1357 (CIT 2020), and "make questionnaire questions affected by

affiliation issues clear," <u>Ta Chen Stainless Steel Pipe Co. v. United States</u>, 31 CIT

794, 823 n. 20 (2007) (cleaned up).  <u>See</u> Pl. WPC Brief in Supp. Mot. for J. on Agency

R., ECF No. 26 (Dec. 5, 2024) at 16 ("WPC Br.").  Although acknowledging that

interested parties "bear the burden of developing an adequate record" and

Commerce has "no independent duty to make a diligent inquiry into any and all

information highlighted by interested parties," <u>Flange Producers</u>, 448 F. 3d at 1357,

WPC insists that Commerce failed to diligently investigate Habich.  WPC Br. at 16.

WPC further argues that Commerce neglected a distinct "administrative law

duty" to respond to comments in which WPC had raised "areas of additional

investigation."  <u>Id.</u> (citing <u>Invenergy Renew. v. United States</u>, 552 F. Supp. 3d 1382,

1399 (CIT 2021)).  Armed with parenthetical citations to D.C. Circuit case law, WPC

emphasizes that this duty "logically includes asking questions of Habich in a

questionnaire when WPC provides a reasonable basis to do so."  <u>Id.</u> at 16.

Finally, WPC stresses that while it lacks "any power whatsoever to gather

information from others, including Habich and [Company X]," Commerce may use

questionnaires to gain additional information from the two companies.  <u>Id.</u> at 17

(citing 19 U.S.C. § 1677m(d) and 19 C.F.R. § 351.301(c)(1)).  WPC notes that while

Commerce lacks subpoena power, <u>see</u> <u>Haixing Jingmei Chem. Prod. Sales Co. v.</u>

<u>United States</u>, 277 F. Supp. 3d 1375, 1383 (CIT 2017), it may still "use facts

available to fill any gaps in the record," id., and should have here.  WPC Br. at 17;

see also 19 U.S.C. § 1677e (discussing Commerce's investigative approach).

Taking these legal contentions together, WPC alleges Commerce's core

failure stemmed from its refusal to engage sufficiently with comments in which

WPC characterized the sales and distribution relationship between Habich and

Company X, including their commission arrangement, as nonsensical.  WPC Br. at

18.  WPC refers to its repeated insistence during the investigation that Habich had

no need for an American sales agent due to its own global commercial relationships,

as well as what WPC views as insufficient or unpersuasive documentation of the

sales relationship.  Id. at 18–19.  The crux of WPC's argument on affiliation is that

to the extent Commerce did inquire into the areas requested by WPC, it did so

through "watered-down" and "broad-based" questions, "eliciting merely conclusory,

self-serving answers" from Habich.  Id. at 21 (citing P.R. 42, C.R. 81 at 4 and IDM

at 5).  Before concluding its discussion of this point, WPC returns to Flange

Producers: "The diligent inquiry obligation does not constitute a requirement that

Commerce seek out additional information where an interested party has not made

a showing that additional information is required."  Id. at 21 n.1 (quoting 448 F.

Supp. 3d at 1357).  Here, WPC contends that Commerce "brushed aside" comments

suggesting the "suspicious" nature of the commission relationship between Habich

and Company X, thereby failing to inquire diligently.  Id. at 22.

The Government and Habich reject WPC's view of Commerce's investigation into the affiliation issue. The Government responds to WPC's complaints, primarily, by recounting the extent and nature of Commerce's administrative review process. The Government underscores how Commerce issued three questionnaires, comprising more than seventy questions, and conducted onsite verification in Austria. Def. United States Brief in Opp. Pl. Mot. for J. on Agency R., ECF No. 31 (Feb. 14, 2025) at 11 ("Gov. Br."). Importantly, as the Government notes, "Commerce found no evidence at verification that contradicted information reported by Habich on which Commerce based its preliminary determination that there was no close supplier relationship between Habich and [Company X]." Id.; see IDM at 4. The Government further highlights how Commerce grounded its investigation, and ultimate analysis, in the statutory and regulatory parameters governing affiliated transactions. Gov. Br. at 12; see also 19 U.S.C. § 1677(33)(G). In sum, the Government contends Commerce reasonably relied on the record evidence that showed no exclusivity arrangement between Habich and Company X and documented their business decisions. Gov. Br. at 12 (citing Habich SQR1).

In addition to reciting Commerce's investigation and the record evidence on which it relied, the Government emphasizes Commerce's discussion of TIJID and Hontex, decisions in which this court noted that the sheer volume or percentage of sales between two parties, absent evidence showing exclusivity or control, is not sufficient to establish affiliation. Gov. Br. at 12–13; (citing 366 F. Supp. 2d at 1299

and 342 F. Supp. 2d 1241−43). In the Government's view, Commerce both

consulted applicable law in structuring its investigation into affiliation and

reasonably construed the relevant record evidence. Id. The Government further

highlights Commerce's discussion of its own past practice, in which it has reasoned:

> A party might have an exclusive relationship with a supplier, customer, or reseller, but still be perfectly capable of acting independently if the exclusive relationship is no longer in its interests. What matters is whether the first party ultimately has other options and thus is not by necessity in the exclusive relationship with the second party.

Id. at 13 (quoting Chlorinated Isocyanurates from the People's Republic of China:

Final Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg.

10,411 (Feb. 24, 2020), accompanying IDM at Comment 1 ("Chlorinated Isos from

China"). Thus, as a process matter, the Government argues that Commerce

understood its legal obligations with respect to affiliation, conducted its inquiry

with the relevant legal principles in mind, and approached its analysis consistent

with both this court's past decisions and Commerce's past practice. Id. at 13−18.

As to the substance, the Government emphasizes that because Commerce neither

found that an exclusive relationship existed between Habich and Company X, nor

that Company X was unable to contract with other suppliers like WPC, the record

evidence falls short of demonstrating affiliation. Id.

Habich echoes the Government's position on affiliation and adds context.

Most notably, Habich stresses the extensiveness of Commerce's onsite verification,

the depth of its consideration of the operational relationship between Habich and

Company X (not merely the legal formalities), and the record evidence that shows

no exclusive arrangement between the two companies.  Def.-Int. Habich Brief in

Opp. Pl. Mot. for J. on Agency R., ECF No. 34 (Mar. 7, 2025) at 9–10 ("Habich Br.").

According to Habich, WPC's allegations regarding the precise share of sales each

company represents in relation to one another are not supported with citations to,

or otherwise supported by, the record evidence.  Id. at 10 (citing CSM at 5 and

Verification at 6).  Habich further emphasizes that much of the information that

WPC argues Commerce must revisit, such as the price negotiations between Habich

and Company X and the nature of Company X's distinct roles as distributor and

sales agent, are already amply documented by record evidence.  Id. at 10–11 (citing

CSM at 4 and Verification at 4).  Thus, to complement the Government's arguments

regarding the sufficiency of Commerce's analysis of the record, Habich seeks to

expose the flawed alternative analytical approach proposed by WPC.

### B.    Applicable Law

Under the Tariff Act of 1930, as amended (the "Act"), Commerce may

disregard below-cost sales in calculating the normal value of imported merchandise.

See 19 U.S.C. § 1677b.  For purposes of calculating the cost of production,

Commerce should disregard an "affiliated" party transaction where the amount

reflected in the transaction "does not fairly reflect the amount usually reflected in

the sales of merchandise under consideration in the home market."  19 U.S.C.

§ 1677b(f)(2).  Typically, whether parties are affiliated, and their transactions

excludable under this rule, turns on if sales were "arms-length."  NSK Ltd. v.

United States, 245 F. Supp. 2d 1335, 1341 (CIT 2003) (citing section 1677b(f)(2)).

 The Act dictates that, where one party to a sale controls the other, the parties

shall be considered affiliated.  19 U.S.C. § 1677(33)(G).  The Act further clarifies

that a party "controls" another if it is "legally or operationally in a position to

exercise restraint or direction" over the other party.  Id.  Building on these

guideposts, Commerce's regulations direct Commerce to consider the following

factors in examining control: "Corporate or family groupings; franchise or joint

venture agreements; debt financing; and close supplier relationships."  19 C.F.R.

§ 351.102(b)(3).  Under this framework, a close supplier relationship is one in which

one party is "reliant" upon the other.  See Statement of Administrative Action for

the Uruguay Rounds Agreements Act, H.R. No. 103-316, (1994), as reprinted in

1994 U.S.C.C.A.N. 4040, 4174-75 ("SAA").  Evidence of control or reliance may be

sufficient to find affiliation if the relationship "has the potential to impact decisions

concerning the product, pricing, or cost" of the merchandise.  19 C.F.R.

§ 351.102(b)(3).  Commerce also considers the "temporal" aspect of the relationship;

"normally, temporary circumstances will not suffice as evidence of control."  Id.

## C. Analysis

 Framed primarily as a dispute over the extensiveness or completeness of

Commerce's investigation, WPC's arguments related to affiliation do not raise a

cognizable basis for remand.  Although stated as based on three distinct lines of

argument, WPC's argument boils down to: Commerce should have asked Habich different questions.  WPC frames its argument in terms of a duty of diligent inquiry rooted in this court's past decisions, a distinct duty to consider aspects of the problem raised by WPC during the review process, and a practical constraint that Commerce is the only actor during an administrative review that can directly pose questions to a respondent like Habich.  Yet even taking these legal contentions as given, WPC's assertions fail to materially undermine Commerce's investigation.

First, insofar as there is a duty of diligent inquiry that stands apart from this court's substantial evidence and arbitrariness frameworks, WPC fails to persuade the court that any such duty has been violated or unfulfilled.  Whether framed as diligence or reasonableness, Commerce's investigative work here passes muster.  The questionnaire and verification phases of Commerce's review were extensive, iterative, and responsive to WPC's comments.  On its face, and as explicated through the PDM, CSM, Verification, and IDM, the record in this case is reasonably robust and reliable.  But more importantly, the diligence principle invoked by WPC serves as little more than dicta, with WPC offering no clear citations to caselaw or administrative determinations by Commerce that should drive this court's reasoning as to the level of diligence required here.  Instead, WPC demands more diligence without showing what additional diligence is necessary.

Next, WPC refers to an administrative law duty that appears to echo the familiar principles of arbitrariness review that calls on Commerce to consider all

important aspects of a problem under investigation.  See SFK USA, 630 F.3d at

1374 (Fed. Cir. 2011) (quoting State Farm, 463 U.S. at 43).  Yet this contention, too,

strains credulity.  As an initial matter, WPC does not meaningfully explain how the

specific items Commerce did not further explore qualify as legally important such

that further consideration was necessary.  In addition, WPC glosses over the

voluminous questionnaires Commerce directed at Habich and the extent to which

they echoed the questions proposed in WPC's comments.  Most significantly, WPC

fails to engage with how Commerce grounded its investigation and its analysis in

applicable legal principles and considered carefully statutory language, regulatory

language, this court's decisions in TIJID and Hontex, and past practice.  See PDM;

CSM; IDM.  Given how Commerce engaged WPC's concerns and applicable law, the

court is not persuaded that an administrative law duty was derogated.

Finally, WPC's argument related to Commerce's unique position as the

investigator in administrative reviews is similarly abstract and unpersuasive.  To

properly characterize the law, WPC acknowledges that it is not entitled to any

special control over the conduct of Commerce's investigations.  To be sure, that

Commerce need not pose every question requested by a petitioner undermines

WPC's argument here.  But even on its own terms, WPC's position here is

inconsistent.  WPC asserts that it "has no ability to conduct discovery, subpoena

documents or witnesses, or otherwise gather information from Habich or [Company

X]."  WPC Br. at 2.  Yet WPC also recognizes Commerce "has no independent duty

to make a diligent inquiry into any and all information highlighted by interested parties," and that "interested parties bear the burden of developing an adequate record on contested issues." Id. at 16 (citing Flange Producers, 448 F. Supp. 3d at 1357). Nor does WPC appear to dispute that Commerce, too, lacks traditional discovery and subpoena powers in antidumping investigations. See id.; see also 19 U.S.C. § 1677e (discussing how Commerce should approach the adequacy of its administrative records and the process by which it finds adverse inferences when parties do not cooperate with requests for information). This context undermines WPC's complaints about Commerce's purported investigative failures. WPC cannot claim Commerce posed materially too few questions or ignored materially too many topics raised by WPC because Commerce directly explored the issues raised by WPC and contemplated by relevant law. See generally PDM; CSM. Further, Commerce did so by grounding its inquiry in regulatory requirements, issuing multiple supplemental questionnaires, and performing onsite verification in Austria. See generally Verification; IDM; see also generally PDM; CSM.

WPC's argument here obscures the fact that it operates as one member of a trio of global strontium chromate producers (i.e., one of only two competitors to Habich), suggesting that it is unusually well positioned to bear its burden of persuading Commerce of the need for further inquiry on the contested issues. It is WPC's prerogative to populate the administrative record primarily through proposed questions, but in doing so WPC must also respect the reasonableness

standard by which this court reviews Commerce's investigations for arbitrariness and substantial evidence. WPC stumbles both in establishing that Commerce is required to do more than it did here and in self-identifying as helpless in the face of questionnaire responses from Habich that describe an industry and market with which WPC is directly familiar. Commerce posed an extensive list of questions to Habich, Habich answered those questions, and Commerce visited Habich in-person to verify those answers – each step indicating a diligent inquiry and a reasonable process. To demand more, on this record, is to mischaracterize the law. Whether viewed in the context of arbitrariness or substantial evidence, Commerce acted reasonably by consulting the relevant legal framework in structuring its inquiry into affiliation, adapting its questions to the concerns raised by WPC, performing a robust verification, and distilling the law and facts that informed its conclusion. WPC offers no persuasive legal authority or record evidence to the contrary.

## II.   Normal Value

### A.   Party Arguments

Regarding Commerce's selection of Mexico as the comparison market for the calculation of normal value, WPC argues the appropriate course of action was to use constructed value, rather than third-country sales. WPC makes three distinct points: (1) Commerce ignored record evidence suggesting that Habich's sales to Mexico were not made in the ordinary course of trade; (2) Commerce unduly relied upon the fact that WPC had raised similar arguments in past administrative

reviews of the Order; and (3) Commerce misinterpreted its regulations by referring to the "examples" listed in section 351.102(b)(35) as "criteria," thereby affording an illustrative list undue weight in its analysis. WPC Br. at 31–34.

On the first point, WPC's view is that Commerce overlooked record evidence suggesting that Mexico is "not a separate and viable comparison market." Id. at 32. On the second point, WPC criticizes Commerce's statement in the IDM that WPC had "repeat[ed] its previous allegations and arguments" from prior administrative reviews. Id. at 33. This, according to WPC, suggests that Commerce's analysis leaned improperly on its familiarity with the substance of WPC's comments, rather than engaging with its "obligation to consider those comments afresh each time." Id. Finally, on the third point, WPC suggests Commerce's legal analysis was improper based on its use of the word "criteria" in its analysis. Id. at 33–34.

The Government and Habich reject WPC's characterizations of the record, its criticisms of Commerce's choice of Mexico as the basis for its normal value analysis, and the premise that a constructed value approach is necessary here. The Government emphasizes that record evidence supported Commerce's view that Habich's sales to Mexico were legitimate and otherwise within the ordinary course of trade. Gov. Br. at 19–21 (citing IDM at 6–8). According to the Government, WPC's arguments fail to undermine record evidence that showed routine market-based sales by Habich in Mexico, including sales made through a different

distributor than Company X, a factual picture that left Commerce with the reasonable choice of Mexico as comparison market.  Id.

The Government also responds to WPC's contentions regarding whether Commerce adequately addressed their concerns and gave undue weight to WPC's participation in prior determinations concerning Austrian SC.  Id.  The Government contends that WPC's invocation of the Federal Circuit's decision in Al Ghurair Iron & Steel LLC v. United States is misplaced.  Id. (citing 65 F.4th 1351 (Fed. Cir. 2023)).  Seeking to distinguish Al Ghurair, the Government explains that whereas the Federal Circuit had been "unable to conclude that Commerce even considered" the relevant comments, in part because its discussion had been "limited to a single paragraph that [was] vague and conclusory," Commerce's work here was extensive, responsive, and grounded in law.  Id. at 19–20; see 65 F.4th at 1363.

The Government also directly addresses WPC's assertion that Commerce misapplied 19 C.F.R. § 351.102(b)(35).  The regulation indeed provides an illustrative list of examples, as WPC contends, but Commerce's consideration of whether the record evidence mirrored those examples neither proves nor disproves WPC's point.  What matters, the Government argues, is what the examples are intended to illustrate – namely, whether the relevant sales "have characteristics that are 'extraordinary for the market in question.'"  Gov. Br. at 20–21 (quoting 19 C.F.R. § 351.102(b)(35)).  Thus, because WPC fails to demonstrate that Habich's sales to Mexico were in any sense "extraordinary," this argument is unavailing.  Id.

Habich, for its part, cautions that the ordinary course analysis is a question of fact, see, e.g., Murata Mfg. Co., Ltd. v. United States, 820 F. Supp. 603, 607 (CIT 1993), and that Commerce's approach to this issue was correspondingly a factual inquiry. Habich Br. at 15. Habich next compares the record evidence that Commerce considered against what Commerce described as the "criteria" of extraordinary sales under the regulation. Id. at 16–17. Far from matching the examples set forth in section 351.102(b)(35), Habich contends, the relevant "sales in Mexico also meet any objective standard as being made within the 'ordinary course of trade.'" Id. at 17. Further, Habich emphasizes that WPC's argument concerning whether Mexico may fairly be characterized as its own market for purposes of this investigation lacks record support and ignores record evidence showing that Habich's sales to Mexico occurred in a "competitive market." Id. at 18.

### B.    Applicable Law

Commerce generally determines the normal value based on the price at which the merchandise is first sold "for consumption . . . in the usual commercial quantities and in the ordinary course of trade," which often reflects a price from the exporting country. § 1677b(a)(1)(B)(i). However, if Commerce finds that the quantity of sales in the exporting country is "insufficient to permit a proper comparison," such as when the respondent does not sell its merchandise in its home country, Commerce looks to sales from a third country. § 1677b(a)(1)(C)(ii); see also 19 C.F.R. § 351.404(f). Commerce also retains the ability to construct normal value

using a combination of sources where sales in the exporting country and elsewhere prove insufficient on their own.  § 1677b(a)(4).  In practice, and consistent with statutory and regulatory guidance, Commerce finds home-country sales insufficient for purposes of calculating normal value where the quantity of such sales represents less than five percent of the aggregate quantity of sales of the subject merchandise in the United States.  See 19 U.S.C. § 1677b(a)(1)(C)(iii); 19 C.F.R. § 351.404(b)(2).

Under the Act, once Commerce's analysis shifts to identifying a viable comparison market through third-country sales, the analysis typically turns on whether the sales were made "in the ordinary course of trade."  Vicentin S.A.I.C. v. United States, 503 F. Supp. 3d 1255, 1262 (CIT 2021), aff'd 42 F.4th 1372 (Fed. Cir. 2022).  Here, "ordinary course of trade" refers to conditions, practices, or circumstances, reasonably close in time to exportation, that are "normal" in the context of the merchandise and trade in question.  See 19 U.S.C. § 1677(15).  Conversely, Commerce considers sales outside the ordinary course of trade where, based on the circumstances, the sales "have characteristics that are extraordinary for the market in question."  19 C.F.R. § 351.102(35).  To aid in Commerce's analysis, the regulations provide an illustrative list of examples that Commerce "might consider as being outside the ordinary course of trade," including sales dealing with off-quality merchandise, unusual product specifications, unusual prices, profits, or terms of sale, or an otherwise affiliated transaction.  Id.

### C.    Analysis

WPC's assertions concerning Commerce's normal value analysis are similarly without merit.  As discussed, WPC advances three points on this issue: first, Commerce ignored evidence suggesting Mexico was not reasonably viewed as an independent market, rendering Habich's sales in the country illegitimate for purposes of calculating normal value; second, Commerce placed undue emphasis on WPC's prior efforts to litigate similar arguments in earlier administrative reviews, suggesting that Commerce's analysis is unreasonably biased; and third, Commerce materially misread its own regulations in referring to "examples" in section 351.102(b)(35) as "criteria," implying that such examples carried dispositive weight.

Taken individually and collectively, these arguments are unpersuasive.  On the first point, WPC fails to root its argument regarding the market realities of Mexico in relevant citations to record evidence, this court's decisions, or past practice by Commerce.  Instead, WPC fixates on the global nature of Habich's business and the fact that the Mexican market for Austrian SC is closely related to the U.S. market.  But this ignores that Commerce grounded its normal value investigation and analysis in record evidence and relevant legal principles.  Commerce correctly rooted its investigation in whether Habich's Mexican sales occurred within the ordinary course of trade, a question which it answered in the affirmative based on record evidence that included verified questionnaire responses and sales documentation.  WPC fails to undermine this evidence.

On the second point, WPC selects a single line from the IDM to suggest that
Commerce's investigation and analysis were biased and, consequently, incomplete.
WPC's reading of the relevant portion of the IDM – in which, among other things,
Commerce noted that WPC had "repeat[ed] its previous allegations and arguments"
from prior segments of the proceeding – is neither the only interpretation of
Commerce's discussion nor the most sensible one.  Although WPC suggests this
discussion as evidence of Commerce's bias against WPC's critiques and reliant upon
conclusions from prior administrative reviews, this contention is unreasonable.
Contrary to WPC's view, the Final Results simply convey that WPC's arguments
related to normal value were familiar to Commerce and yet still failed to overcome
the record evidence.  To read the IDM as suggesting otherwise is to depart from the
fact and the law.  The court is not persuaded by this strained interpretation.

On the third point, WPC's position is equally unavailing.  As an initial
matter, WPC's argument suggests that the word Commerce used to describe the
illustrative list in section 351.102(b)(35), "criteria," is materially different from the
word contained in the regulation itself, "example."  WPC appears to conclude that
such a distinction exists and matters without offering support.  That alone
undermines its position.  Even cursory consideration of these two words and their
definitions suggests they are neither mutually exclusive nor sufficiently different to
render Commerce's legal analysis flawed.  For example, Webster's Thesaurus
characterizes "criterion" as "something set up an example against which others of

the same type are compared," including "example" among its primary synonyms. CRITERION, MERRIAM-WEBSTER THESAURUS (Sept. 29, 2025), https://www.merriam-webster.com/thesaurus/criterion.  WPC cites no dictionary definitions or legal principles to the contrary.  More fundamentally, WPC offers no substantive critique of how Commerce analyzed the illustrative list, whether dubbed criteria or examples, nor disputes Commerce's regulatory duty to consider those examples and afford them some weight.  In short, WPC's "criteria" contention is a conclusion in search of an argument – and fails accordingly.

Like its affiliation arguments, WPC's normal value complaints fall short of materially undermining Commerce's investigation and analysis.  What limited record evidence WPC presents as supporting its assertions on this issue fails to complicate the otherwise significant factual and legal support Commerce leveraged in support of its review here.  More importantly, WPC's interpretation of the record is strained and significantly understates the amount of consideration Commerce gave this issue and the concerns expressed by WPC.  Simply put, WPC demands an investigative approach from Commerce that is unpersuasive on its own terms and unsupported by applicable law.  As with affiliation, Commerce grounded its work on normal value in the relevant legal principles, responded appropriately to WPC's concerns, and provided ample evidentiary support and adequate reasoning.

Court No. 24-00105                                                    Page 28

## CONCLUSION

For the foregoing reasons, the court holds that Commerce investigated and analyzed the issues disputed by WPC reasonably and in accordance with law. Thus, the court sustains the determination in full. Judgment will enter accordingly.

/s/      Joseph A. Laroski, Jr.
Joseph A. Laroski, Jr., Judge

Dated: October 29, 2025
        New York, New York